THE HEBREW UNIVERSITY ASSOCIATION *v.* GEORGE O. NYE ET AL., EXECUTORS (ESTATE OF ETHEL S. YAHUDA)

BALDWIN, C. J., KING, MURPHY, MELLITZ and SHEA, Js.

Argued February 8—decided March 28, 1961

*John J. Resnik,* with whom, on the brief, was *Nathan A. Resnik,* for the appellants (defendants).

*Louis Feinmark,* with whom was *Irving Smirnoff,* for the appellee (plaintiff).

KING, J. The plaintiff obtained a judgment declaring that it is the rightful owner of the library of Abraham S. Yahuda, a distinguished Hebrew scholar who died in 1951. The library included rare books and manuscripts, mostly relating to the Bible, which Professor Yahuda, with the assistance of his wife, Ethel S. Yahuda, had collected during his lifetime. Some of the library was inventoried in Professor Yahuda's estate and was purchased from the estate by his wife. There is no dispute that all of the library had become the property of Ethel before 1953 and was her property when she died on March 6, 1955, unless by her dealings with the plaintiff between January, 1953, and the time of her death she transferred ownership to the plaintiff. While the defendants in this action are the executors under the will of Ethel, the controversy as to ownership of the library is, in effect, a contest between two Hebrew charitable institutions, the plaintiff and a charitable trust or foundation to which, as hereinafter appears, Ethel bequeathed the bulk of her estate.

The pertinent facts recited in the finding may be summarized as follows: Before his death, Professor Yahuda forwarded certain of the books in his library to a warehouse in New Haven with

instructions that they be packed for overseas shipment. The books remained in his name, no consignee was ever specified, and no shipment was made. Although it is not entirely clear, these books were apparently the ones which Ethel purchased from her husband's estate. Professor Yahuda and his wife had indicated to their friends their interest in creating a scholarship research center in Israel which would serve as a memorial to them. In January, 1953, Ethel went to Israel and had several talks with officers of the plaintiff, a university in Jerusalem. One of the departments of the plaintiff is an Institute of Oriental Studies, of outstanding reputation. The library would be very useful to the plaintiff, especially in connection with the work of this institute. On January 28, 1953, a large luncheon was given by the plaintiff in Ethel's honor and was attended by many notables, including officials of the plaintiff and the president of Israel. At this luncheon, Ethel described the library and announced its gift to the plaintiff. The next day, the plaintiff submitted to Ethel a proposed newspaper release which indicated that she had made a gift of the library to the plaintiff. Ethel signed the release as approved by her. From time to time thereafter she stated orally, and in letters to the plaintiff and friends, that she "had given" the library to the plaintiff. She refused offers of purchase and explained to others that she could not sell the library because it did not belong to her but to the plaintiff. On one occasion, when it was suggested that she give a certain item in the library to a friend, she stated that she could not, since it did not belong to her but to the plaintiff.

Early in 1954, Ethel began the task of arranging and cataloguing the material in the library for crat-

ing and shipment to Israel. These activities continued until about the time of her death. She sent some items, which she had finished cataloguing, to a warehouse for crating for overseas shipment. No consignee was named, and they remained in her name until her death. In October, 1954, when she was at the office of the American Friends of the Hebrew University, a fund-raising arm of the plaintiff in New York, she stated that she had crated most of the miscellaneous items, was continuously working on cataloguing the balance, and hoped to have the entire library in Israel before the end of the year. Until almost the time of her death, she corresponded with the plaintiff about making delivery to it of the library. In September, 1954, she wrote the president of the plaintiff that she had decided to ship the library and collection, but that it was not to be unpacked unless she was present, so that her husband's ex libris could be affixed to the books, and that she hoped "to adjust" the matter of her Beth Yahuda and her relations to the plaintiff. A "beth" is a building or portion of a building dedicated to a particular purpose.

The complaint alleged that the plaintiff was the rightful owner of the library and was entitled to possession. It contained no clue, however, to the theory on which ownership was claimed. The prayers for relief sought a declaratory judgment determining which one of the parties owned the library and an injunction restraining the defendants from disposing of it. The answer amounted to a general denial. The only real issues raised in the pleadings were the ownership and the right to possession of the library. As to these issues, the plaintiff had the burden of proof. *Kriedel* v. *Krampitz,* 137 Conn. 532, 534, 79 A.2d 181; *Holt* v. *Wissinger,*

145 Conn. 106, 109, 139 A.2d 353. The judgment found the "issues" for the plaintiff, and further recited that "a trust [in relation to the library] was created by a declaration of trust made by Ethel S. Yahuda, indicating her intention to create such a trust, made public by her." We construe this language, in the light of the finding, as a determination that, at the luncheon in Jerusalem, Ethel orally constituted herself a trustee of the library for future delivery to the plaintiff. The difficulty with the trust theory adopted in the judgment is that the finding contains no facts even intimating that Ethel ever regarded herself as trustee of any trust whatsoever, or as having assumed any enforceable duties with respect to the property. The facts in the finding, in so far as they tend to support the judgment for the plaintiff at all, indicate that Ethel intended to make, and perhaps attempted to make, not a mere promise to give, but an executed, present, legal gift inter vivos of the library to the plaintiff without any delivery whatsoever.

Obviously, if an intended or attempted legal gift inter vivos of personal property fails as such because there was neither actual nor constructive delivery, and the intent to give can nevertheless be carried into effect in equity under the fiction that the donor is presumed to have intended to constitute himself a trustee to make the necessary delivery, then as a practical matter the requirement of delivery is abrogated in any and all cases of intended inter-vivos gifts. Of course this is not the law. A gift which is imperfect for lack of a delivery will not be turned into a declaration of trust for no better reason than that it is imperfect for lack of a delivery. Courts do not supply conveyances where there are none. *Cullen* v. *Chappell,* 116 F.2d 1017,

1018 (2d Cir.). This is true, even though the intended donee is a charity. *Organized Charities Assn.* v. *Mansfield,* 82 Conn. 504, 510, 74 A. 781. The cases on this point are collected in an annotation in 96 A.L.R. 383, which is supplemented by a later annotation in 123 A.L.R. 1335. The rule is approved in 1 Scott, Trusts § 31.

It is true that one can orally constitute himself a trustee of personal property for the benefit of another and thereby create a trust enforceable in equity, even though without consideration and without delivery. 1 Scott, op. cit. § 28; § 32.2, p. 251. But he must in effect constitute himself a trustee. There must be an express trust, even though oral. It is not sufficient that he declare himself a donor. 1 Scott, op. cit. § 31, p. 239; 4 id. § 462.1. While he need not use the term "trustee," nor even manifest an understanding of its technical meaning or the technical meaning of the term "trust," he must manifest an intention to impose upon himself enforceable duties of a trust nature. *Cullen* v. *Chappell,* supra; Restatement (Second), 1 Trusts §§ 23, 25; 1 Scott, op. cit., pp. 180, 181. There are no subordinate facts in the finding to indicate that Ethel ever intended to, or did, impose upon herself any enforceable duties of a trust nature with respect to this library. The most that could be said is that the subordinate facts in the finding might perhaps have supported a conclusion that at the luncheon she had the requisite donative intent so that, had she subsequently made a delivery of the property while that intent persisted, there would have been a valid, legal gift inter vivos. See cases such as *Bachmann* v. *Reardon,* 138 Conn. 665, 667, 88 A.2d 391; *Hammond* v. *Lummis,* 106 Conn. 276, 280, 137 A. 767, and *Burbank* v. *Stevens,* 104 Conn. 17, 23, 131 A.

742. The judgment, however, is not based on the theory of a legal gift inter vivos but on that of a declaration of trust. Since the subordinate facts give no support for a judgment on that basis, it cannot stand.

While this is dispositive of the appeal adversely to the plaintiff, it may assist in the retrial if certain other matters are briefly mentioned.

By her will, which was executed on November 19, 1953, Ethel provided for the establishment of a foundation in Israel to perpetuate her name and that of her husband, if, as proved to be the case, she failed to establish the foundation during her lifetime. The will also named special trustees, in Israel, to carry out the project in case none were appointed by her before she died. By the second clause of her will, she gave "all . . . [her] real and the remainder of . . . [her] personal estate" to two named trustees, residing in New Haven, in trust to liquidate and, from the proceeds, to pay debts, funeral and testamentary expenses, death taxes, and legacies. By the third clause, she directed the New Haven trustees to transfer the balance of the proceeds to the trustees of the foundation in Israel. The only other dispositive provision in the will was one in the eighth clause bequeathing to her sister most of the furniture, silver and jewelry. In its memorandum of decision, the trial court seized upon the distinction drawn in the second clause between real estate and personal estate, and the use of the word "remainder" in connection with the personal estate, as constituting a recognition by Ethel that she had already disposed of the library. Also, in the finding it is stated that the word "remainder" as used in the second clause meant the personal property other than the library. There is no justification

for that finding or for the statement in the memorandum of decision. The word "remainder" must have been used, not in the technical sense of an estate limited to take effect in possession at the expiration of a prior estate created by the same instrument, but in the loose sense of "rest" or "balance." As such, it would naturally refer to the rest or balance of the personal property owned by the testatrix and not otherwise given by the will, that is, the balance over and above that disposed of in the eighth clause. It could hardly refer to the balance exclusive of the library, because if Ethel did not own the library it would not be affected by her will and there would be no need of excluding it from the operation of the will. A trust res is no part of the trustee's personal estate.

The finding, besides reciting the conclusion of the court that Ethel constituted herself the trustee of an express oral trust for the benefit of the plaintiff, contained the conclusion that she intended "to give" the library to the plaintiff and "took all the steps for delivery of possession . . . to the plaintiff which the circumstances afforded." If the court meant by the quoted language to indicate that a legal inter-vivos gift was effected, there would be a material inconsistency within the finding and between the judgment and the finding. This would be so because there is a well-recognized distinction between a gift inter vivos and a declaration of trust; a single transaction cannot be both. 38 C.J.S. 785, § 8. A similar inconsistency within the finding is indicated, if not established, by the conclusion that the plaintiff acted to its detriment in reliance upon "the declaration of gift and trust." Furthermore, while the doctrine of reliance might constitute a reason for the imposition of a constructive trust;

1 Scott, Trusts §§ 31.3, 31.4; note, 12 A.L.R.2d 961, 963; 1 Corbin, Contracts §§ 200-206, 209; Restatement, 1 Contracts § 90; it could play no part in a decision predicated, as the judgment showed the present one was, on an express oral trust, since such a trust needs no consideration for its validity.

To support a factual conclusion of an executed inter-vivos gift, there would have to be a donative intention and at least a constructive delivery. See cases such as *Candee* v. *Connecticut Savings Bank,* 81 Conn. 372, 374, 71 A. 551; *McMahon* v. *Newtown Savings Bank,* 67 Conn. 78, 80, 34 A. 709. It is true that the donative intention need not be expressed, nor the delivery made, in any particular form or mode. *Fasano* v. *Meliso,* 146 Conn. 496, 502, 152 A.2d 512, and cases cited. Here, there was no actual delivery of the library; nor was there any constructive delivery. *Candee* v. *Connecticut Savings Bank,* supra; *Prendergast* v. *Drew,* 103 Conn. 88, 91, 130 A. 75; 24 Am. Jur. 745, § 28; 1 Scott, op. cit., p. 230. No manual delivery of the library could have been made at the time of the expression of the donative intention in Jerusalem, since the library was then in the United States. But there is nothing in the finding to show that constructive delivery was attempted in Jerusalem or that any delivery of any kind was attempted after Ethel's return to the United States. Ethel did not, for instance, make any delivery either of the library or of a document of title purporting to represent the ownership of the library. See *McMahon* v. *Newtown Savings Bank,* supra; notes, 63 A.L.R. 537, 550, 48 A.L.R.2d 1405, 1413. For a constructive delivery, the donor must do that which, under the circumstances, will in reason be equivalent to an actual delivery. It must be as nearly perfect and complete as the nature

of the property and the circumstances will permit. 24 Am. Jur. 744, § 27. Just what, if any, form of constructive delivery would have been adequate, under the circumstances of this case, when Ethel was in Jerusalem, or what form of actual or constructive delivery would have been adequate after her return to the United States, we have no occasion to determine, since the finding discloses no delivery whatsoever.

The judgment declaring that the plaintiff is the owner of the library is without support in the finding and cannot stand. We cannot, however, as the defendants urge, remand the case for the entry of judgment in their favor, since, as previously pointed out, the finding within itself contains inconsistencies, is at variance with the recitals in the judgment, and is based upon an erroneous view of the controlling law. What finding would have been made had these errors not crept in we have no means of knowing. The case must therefore be remanded for a new trial. See cases such as *Thomas F. Rogers, Inc.* v. *Hochberg,* 143 Conn. 22, 25, 118 A.2d 910.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.