## IN THE MATTER OF GERALDINE R. DODGE, AN ALLEGED MENTAL INCOMPETENT.

Superior Court of New Jersey
Chancery Division

Decided February 3, 1966.

*Messrs. Stryker, Tams & Dill* for Fidelity Union Trust Company and Peter C. Notland, substituted guardians (*Mr. Emory C. Risley* appearing; assisted by *Mr. James E. Davidson*).

*Messrs. Pitney, Hardin & Kipp* for plaintiff, Elmira College (*Mr. Donald Kipp* appearing; assisted by *Mr. George L. Mahr*).

HERBERT, J. S. C. The docket in this case was opened by a complaint alleging that Geraldine R. Dodge had become mentally incompetent and required a guardian. There was an adjudication of incompetency on that complaint, and since then various questions in the case relating to the administration of the guardianship have come before the court.

The questions now under consideration have been raised by Elmira College, a college for women located at Elmira, New York. The college filed its complaint in the guardianship case alleging that Mrs. Dodge made a gift to the college of her entire "collection of paintings, pictures, jade, bronze and various objects d'art." The complaint was thereafter amended to add allegations that Mrs. Dodge—if she had not made an effective gift—had made a binding promise to give the collections to the college. There was an order to show cause on the college's original complaint and, following the amendment, the guardians responded by filing an answer. Although the college might have asserted its claims in an independent suit, no objection by the guardians has been made to the form of the proceeding. I am satisfied that no worthwhile criticism can be made of the procedure followed. In all important respects the matter has proceeded to trial as though it had been brought as a separate action bearing its own docket number. Depositions were taken and, in addition to that, counsel cooperated in an exemplary way to inspect papers and exchange available information without the time and expense of formal discovery. The case was also pretried and a pretrial order entered. Following all this there was a trial which lasted for several days.

The case of the college is based upon a letter dated May 16, 1961 which reads as follows:

"May 16, 1961

Mr. Harold W. McGraw, Sr.
Chairman of the Board of Trustees
Elmira College
Elmira, New York

Dear Mr. McGraw:

By this letter I wish to confirm the arrangements I have discussed with you concerning my entire collection of paintings, pictures, jade, bronze, and various objects d'art located in my home at Sixty-first Street and Fifth Avenue in New York City, at my New Jersey residence at Giralda Farms in Madison, New Jersey, and in storage in various places in New York City and elsewhere.

I wish to present and hereby do present and convey title to all of these items as a gift to Elmira College. It is to be understood, however, that I may retain possession of such items as long as I am able to enjoy them. I understand that the College has facilities available where these objects may be properly displayed and located, or will prepare such a display area for them. From time to time, I will relinquish possession of these items to the College as I desire.

It is my hope that the College, its students, alumnae and friends will receive the same benefit and enjoyment from these objects as I have been privileged to receive.

Sincerely,
/s/ Geraldine R. Dodge
(Mrs.) Geraldine R. Dodge"

Mrs. Dodge, a daughter of William Rockefeller, is a woman of great wealth. She has no living descendants and her husband, Marcellus Hartley Dodge, who lived until December 25, 1963, possessed an independent fortune. All of these facts were well known in 1961 and earlier to the men, such as Mr. McGraw, who were interested in Elmira College.

Long before the date of the quoted letter, determined and persistent efforts had been made to interest Mrs. Dodge in Elmira College. To a considerable extent her interest was aroused. In the spring of 1957 she accepted an invitation to pay the college a visit. A letter she wrote to Mr. McGraw following that visit included these paragraphs:

"I feel as though I had had a liberal education, having been with you and Mr. Shoemaker on the wonderful trip to Elmira. I am so deeply indebted to you both for all you did to make this vacation for me a memorable one. I enjoyed every minute of it, and it will remain a red-letter time for me to remember.

I was much impressed with the whole set-up at Elmira, with Dr. and Mrs. Murray, the members of the Board, and also the type of students I saw, and their general attitude. It is different from many colleges I have visited. I feel also that the location in the heart of the state is a great asset. I was pleased to hear that you do not intend to increase much the size of the student body, as that might alter the close relations they have with the faculty. I am sure it must be very satisfying to you to have such a large part in all this. The college is to be congratulated in having the services of such men as yourself."

In 1957, not long after she had been at Elmira, she gave the college $30,000 to be used for the purchase of land to enlarge the campus. Her next gift consisted of about 220 antique Chinese porcelains, having an appraised value of approximately $50,000. These were actually sent to the college in May 1960, but her intention to send them had been announced more than a year earlier. Then, on June 28, 1960, she signed a formal pledge card for $250,000, which bears this note:

"This fund of 250,000—is to be used to erect a building to house all art objects that I have given & may give in the future—to be known as the Geraldine R. Dodge Building."

At or about the same time she was given an honorary degree by the college. The acceptance of a degree had been discussed with her at least as early as January 1959, but she made no trip to the college to receive it until the end of June 1960.

In or about the summer of 1960 the college acquired a new residence to be used by its presidents and, according to the testimony of Dr. Murray, Mrs. Dodge made a gift of money toward the expense of furnishing and reconditioning the house. In the same general period two payments of $100,000 each on account of her pledge of June 28, 1960 were made. The checks were sent on September 9, 1960 and January 10, 1961, and both of her covering letters made reference to "the proposed building."

The possibility of a gift of Mrs. Dodge's entire collection of paintings and art objects was mentioned by Mr. McGraw in a memorandum to Dr. Murray and Mr. Perry M. Shoe-

maker, November 28, 1960. During this period Mr. McGraw had a fairly regular schedule of meetings with Mrs. Dodge. In his memorandum of November 28 he said that she desired to discuss the proposed gift with Murray, Shoemaker and himself and suggested a dinner engagement for December 6. The group did meet at dinner on or about December 6 and Mrs. Murray was included. On December 13, 1960 Dr. Murray wrote to Mrs. Dodge referring to the evening spent with her and saying:

"We were thrilled beyond expression to listen to the discussion about the possibilities of your housing your tremendous collection of various art objects at Strathmont. I think you join us in feeling that there could not be a more perfect setting for displaying the excellent collection which has long been so meaningful to you. The setting at Strathmont is unique and is of such a nature that our society will undoubtedly not be reproducing grounds and buildings which would be so in keeping with the quality and beauty of your art objects.

The tremendous significance that the collection could have to our academic program and the influence on the young women who will be coming to Elmira College could very well produce the most monumental step in many many years at Elmira in making the College the quality institution that all of us desire it to be. If there is to be a Geraldine R. Dodge Center at Strathmont, not only would our Art Department receive tremendous impetus, but the potentialities of the total use of Strathmont are so unlimited that its functioning would permeate every aspect of the College."

On January 4, 1961 Mr. McGraw again wrote to Dr. Murray and Mr. Shoemaker, making reference to the Dodge paintings and art objects as though there had by that time been a definite decision to donate the entire collection. He also wrote to the college architect December 29, 1960 about tentative plans for altering the Strathmont mansion, and in his letter referred to the gift of Mrs. Dodge as follows:

"As I think you know, she is giving all of her art objects, paintings, etc., to Elmira College (for the moment please keep this confidential). Her gifts to Elmira College will be more than enough to fill the entire building at Strathmont."

These communications, being sent by Mr. McGraw to other representatives of the college, of course, do not bind Mrs.

Dodge or her guardians, but they do help in establishing a sequence of developments.

The next important step took place on January 28, 1961 when the board of trustees of the college met and adopted a resolution expressing its gratitude to Mrs. Dodge, which resolution included these two paragraphs:

"WHEREAS, she is giving to Elmira College an incomparable and priceless collection of art objects, and

WHEREAS, she has made available the funds to provide for the appropriate display and educational utilization of these art objects, thereby enhancing immeasurably the academic programs of Elmira college."

An ornamental leather folder containing a copy of this resolution and a letter expressing the appreciation of all of the members of the executive committee were presented to her at a later date. She acknowledged them by a note to Mr. McGraw in her own hand in which she said:

"I cannot tell you how deeply I appreciate your sending me the testimonial & letter which you gave me last night. It has touched me deeply & quite overcame me. It is very hard for me to express adequately my appreciation. What I have helped you do for Elmira has been a great pleasure & privilege for me & I feel the thanks are all on my side."

In March 1961, at Giralda Farms, her estate at Madison, Mrs. Dodge entertained Mr. McGraw, Dr. and Mrs. Murray, Mr. Shoemaker and Mr. William Decker. One purpose of the gathering was to permit her guests to view some of her paintings and objects of art. Another purpose, at least from the standpoint of the group representing the college, was to have photographs taken which could be used as a part of publicity material to be prepared and sent out by the college in announcing Mrs. Dodge's gift. The photographs were in fact taken and, as might be supposed, some of them show members of the group, including Mrs. Dodge, examining paintings and bronzes or standing adjacent to them. A selection of the pictures taken that evening was later given to Mrs. Dodge. The gift was accompanied by a letter from Dr. Murray dated

April 22, 1961. When asked, however, to consent to a formal public announcement of a gift of her collections to the college, she requested that such be delayed.

In February 1961 Mrs. Dodge told Miss Ellis, her companion, that Elmira College wanted her to give her art collection to the college and that she was thinking about doing so. In the same connection, although not at the same time, she told Miss Ellis that she had originally thought of building a museum at Giralda Farms but would not want to do so if a large new airport was going to be established in the Morris County area. After the dinner in March 1961, when the photographs already mentioned were taken, Mrs. Dodge told Miss Ellis that she was going to give some of her collection from time to time to the college.

The men who were acting for the college desired to have something in writing from Mrs. Dodge. In April 1961, not long after the party at which the pictures were taken, a letter was drafted for presentation to her which was very like the letter of May 16, 1961, quoted above. In the April draft, however, the first sentence of the second paragraph read as follows:

"I wish to present these items, as a gift, to Elmira College, but to retain possession of them so long as I am able to enjoy them."

Mr. McGraw took the April draft to her, but instead of signing it she retained it for consideration. It was ultimately found, unsigned, among her papers when the guardians began to investigate the claim of the college.

The executive committee of the board of trustees of the college met on May 1, 1961 and the draft of letter which had been submitted to Mrs. Dodge was discussed. A revision was suggested and as a result the first sentence of the second paragraph of the draft became the following two sentences:

"I wish to present and hereby do present and convey title to all of these items as a gift to Elmira College. It is to be understood, however, that I may retain possession of such items as long as I am able to enjoy them."

This language, as already noted, appears in the signed letter of May 16, 1961.

The letter which Mrs. Dodge signed on May 16 was delivered to her by Mr. McGraw on May 2 when they were having one of their fairly frequent dinners together at a restaurant in New York City. The day after that dinner Mr. McGraw sent a memorandum to Dr. Murray and Mr. Shoemaker:

"Ralph Murray gave me a revised letter of agreement in regard to the bric-a-brac, paintings, china etc., that she will give to Elmira College. I read this letter to her twice and pointed out the advantages of doing it in this manner which includes tax deduction possibilities. She liked it and claimed that she would sign it and return it to me. However, before doing so she wanted to study it some more."

On May 16 Mrs. Dodge and Mr. McGraw again met for dinner and at that meeting the letter was signed and delivered. In a memorandum dated the following day from Mr. McGraw to Dr. Murray and Mr. Shoemaker there is this comment about a plan for delivery of articles to the college:

"It is Mrs. Dodge's wish to start turning over all of her belongings to Elmira College in July. As I told you previously, the first objects to go to the College will be from storage. Then will come the objects that are in her Fifth Avenue home and finally the material that is in Madison."

It was not until January 1962, however, that any articles were actually shipped. About 20 bronzes, having an appraised value of $77,000, were then delivered to the college. The testimony indicates that she had selected these with considerable care. The complaint for a declaration of incompetency was filed June 7, 1963. Between the shipment of the bronzes and that date nothing more was sent to the college.

In July 1961 Mrs. Dodge was elected a trustee of the college. It had been suggested to her earlier that she would be elected if she were willing to accept, but she had at that time declined because of other responsibilities. She never attended a meeting of the board.

After May 16, 1961 there were some developments from which it can be suggested that the letter of that date was not regarded by Mrs. Dodge as the clear-cut statement of gift which on its face it appears to be. As noted, the only articles shipped to the college following the signing of the letter were 22 bronzes, not a large fraction of the entire art collection. After they had been shipped Mrs. Dodge remarked to her companion, Miss Ellis, "That ends that," a statement which might be taken to indicate the conclusion of a particular task, or that the final shipment to Elmira College in Mrs. Dodge's lifetime had been made, or that the final shipment for all time had been made.

During a large part of the period with which we are concerned Mr. Paterson was Mrs. Dodge's business manager. He died, and by October 1961 Mr. Edwin J. Sayres had become his successor. On October 31, 1961 he wrote to Dr. Murray saying that he had reported to Mrs. Dodge upon a telephone conversation between the two men and went on to say that, "points have entered this matter which at the moment are a bit puzzling:

First: Mrs. Dodge does not recall acknowledging the change of name of Strathmont to Geraldine R. Dodge Center.

Second: The extent to which art objects to be sent to Elmira from Mrs. Dodge's collection has not been determined according to any commitments of record here at Giralda.

Mrs. Dodge is also not mindful of any extensive or elaborate facilities being provided for any past or future acquisitions that may be selected from her collection."

Having been given a copy of Mr. Sayres' letter, Mr. McGraw responded to it in part as follows:

"In this letter, you mentioned that Mrs. Dodge did not realize that the Strathmont property at Elmira College had been renamed by the Board of Trustees to the Geraldine R. Dodge Center. I am confident that you will find that Mrs. Dodge does know about this change for I talked to her about this matter on many occasions. I instigated this change and the Board fully agreed with me because of her great interest in the College and the help that she has extended to it.

"Second, you mentioned the extent to which art objects are to be sent to Elmira from Mrs. Dodge's collection. As far as I know, there is no commitment as to when any piece of art or any paintings are to be sent to the college. It has always been my impression that items are to be sent to the College when Mrs. Dodge desires to release them."

What has already been said is not intended as a complete summary of the testimony and exhibits. Such a summary appears to be unnecessary. The general comment can be made that there are no substantial disputes of fact between the parties, their major differences being as to conclusions to be drawn from admitted facts.

Mrs. Dodge's letter of May 16, 1961 is at the center of the case. It may be regarded as an attempt to indicate a present transfer of rights of ownership in the art collection to the college, subject, however, to a retained life interest (at most) entitling the donor to possession for enjoyment of all or some of the articles given. Incidentally, it may be noted that the subject matter of the gift claimed by the college would lend itself to such retention, no elements of obsolescence or deterioration through use being involved. Our law recognizes life estates in personal property. 1 *American Law of Property*, § 4.4, *p.* 413 (1952) ; *In re Van Wagoner's Estate*, 97 *A.* 893 (*Prerog.* 1916). The question remains, was this letter sufficient to effect a valid *inter vivos* gift *in praesenti?*

The elements of an *inter vivos* gift were listed in *Farris v. Farris Engineering Corp.*, 7 *N. J.* 487 (1951), as follows:

"The requisite elements of such an *inter vivos* gift are (1) a donative intent on the part of the donor; (2) an actual (or symbolical) delivery of the subject-matter of the gift; and, (3) an absolute relinquishment by the donor of ownership and dominion over the subject-matter of the gift, at least to the extent practicable or possible, considering the nature of the thing to be given. *Farrow v. Farrow*, 72 *N. J. Eq.* 421 (*E. & A.* 1907) ; *Kirkpatrick v. Kirkpatrick*, 106 *N. J. Eq.* 391, 398 (*Ch.* 1930) ; *Hanstein v. Kelly*, 131 *N. J. Eq.* 132 (*Prerog. Ct.* 1942) ; *Kelly v. Kelly*, 134 *N. J. Eq.* 316, 319 (*Prerog.* 1944). The proof of these essential elements should be clear, cogent and persuasive. *Farrow v. Farrow, supra; Kelly v. Kelly, supra.*" (at *pp.* 500–501)

In addition to the authorities cited in *Farris,* reference may be made to *Swayze v. Huntington,* 82 *N. J. Eq.* 127, 133 (*Ch.* 1913), affirmed on opinion below, 83 *N. J. Eq.* 335 (*E. & A.* 1914), which is relied upon by the guardians.

I regard the letter of May 16, 1961 as a clear statement by Mrs. Dodge of her donative intent, and so find. The extent to which this intent was spontaneous with her or, on the other hand, was stimulated by the persistent solicitations of the representatives of the college is unimportant. Of the three elements stated in the foregoing quotation from *Farris,* the first is present here, but those numbered (2) and (3) raise special problems.

In a case which is comparable to this one in the sense that a university's claim to a gift was involved, the court held no gift had been made although the intent to make one *in praesenti* was clearly established. There had been no actual delivery of the books and manuscripts of a valuable library, but only extensive preparations to make the library ready for shipment. *Hebrew University Ass'n v. Nye,* 148 *Conn.* 223; 169 *A.* 2*d* 641 (*Sup. Ct. Err.* 1961). That case, however, did not involve any reservation of a life estate or other interest of ownership by the alleged donor. The same comment can be made about *Farris* and *Swayze* and about other New Jersey authorities cited in those two opinions. The courts were addressing themselves to the question of whether there had been a gift of all rights of ownership or no gift at all. Our question is whether Mrs. Dodge made a gift of an interest in the nature of a remainder, retaining for herself the right to enjoy the art collection. The ordinary principles governing gifts must be considered accordingly.

Prompt delivery of all of the Dodge art to the college would have been inconsistent with the gift which was intended. To send the entire collection to Elmira and then have it returned so that Mrs. Dodge might take advantage of her reserved rights of enjoyment would have been in a practical sense an absurdity.

In a case involving an alleged gift *causa mortis,* and on facts which have no particular interest here, Justice Jacobs filed a dissenting opinion containing helpful references to the law reviews. *Foster v. Reiss,* 18 *N. J.* 41, 56 (1955). He quoted with approval from Gulliver and Tilson, *"Classification of Gratuitous Transfers,"* 51 *Yale L. J.* 1, 2, (1941) :

"One fundamental proposition is that, under a legal system recognizing the individualistic institution of private property and granting to the owner the power to determine his successors in ownership, the general philosophy of the courts should favor giving effect to an intentional exercise of that power. This is commonplace enough but it needs constant emphasis, for it may be obscured or neglected in inordinate pre-occupation with detail on dialectic. A court absorbed in purely doctrinal arguments may lose sight of the important and desirable objective of sanctioning what the transferor wanted to do, even though it is convinced that he wanted to do it."

Justice Jacobs followed that quotation with these comments :

"Harlan F. Stone in his discussion of *Delivery in Gifts of Personal Property,* 20 *Col. L. Rev.* 196 (1920), points out that the rule requiring delivery is traceable to early notions of seisin as an element in the ownership of chattels as well as land; and he expresses the view that as the technical significance of seisin fades into the background, courts should evidence a tendency to accept other evidence in lieu of delivery as corroborative of the donative intent. See *Philip Mechem, The Requirement of Delivery in Gifts of Chattels,* 21 *Ill. L. Rev.* 341, 345 (1926). Nevertheless, the artificial requirement of delivery is still widely entrenched and is defended for modern times by Mechem (*supra,* at 348) as a protective device to insure deliberate and unequivocal conduct by the donor and the elimination of questionable or fraudulent claims against him."

Delivery of the subject matter of an alleged gift may serve a double purpose, as indicated in the foregoing quotation. It may establish or help to establish intent and will "insure deliberate and unequivocal conduct by the donor and the elimination of questionable or fraudulent claims against him." But this emphasis on delivery presupposes a factual situation in which delivery would be appropriate. Such a situation is not present here. Mrs. Dodge's donative intent needs no corroboration from an act of delivery (although the shipment of the bronzes in January 1962 may be regarded as somewhat cor-

roborative). The proofs otherwise establish that intent and show that she did act deliberately and unequivocally when she signed and gave to Mr. McGraw the letter of May 16, 1961.

The third requirement for a valid gift *inter vivos,* in the words of *Farris, supra,* is "an absolute relinquishment by the donor of ownership and dominion over the subject-matter of the gift, at least to the extent practicable or possible, considering the nature of the thing to be given." By the terms of the gift intended by Mrs. Dodge she was to retain dominion over the art collection, possibly for the rest of her life, perhaps for a shorter time if she so decided. Considering the nature of the interest to be transferred to the college, such retention was not incompatible with a transfer. One who holds a life interest in personal property not only has the rights of use and enjoyment consistent with his ownership; he also has the duty to care for the property and keep it in repair. *Burlington County Trust Co. v. Kingsland,* 18 *N. J. Super.* 223, 233 (*Ch. Div.* 1952). To state the obvious, such person is an owner and can behave like one.

It will be noted that the absolute relinquishment of ownership and dominion called for by *Farris* is qualified by the statement that such relinquishment shall take place "at least to the extent practicable or possible, considering the nature of the thing to be given." I think these qualifying words were used in recognition of the distinction between different types of property; for example, between a painting on the one hand and a bank account represented by a pass book on the other. I doubt that the *Farris* court was considering a donor who might wish to give a remainder interest in tangible personal property. Nevertheless, the quoted qualifying words may be said to reflect the principle that absolute relinquishment of ownership and dominion over the subject matter of an intended gift is not a necessary element of a valid transfer if such relinquishment would be impractical or impossible. And the gift of a remainder by a donor who retains a life estate presents such a situation even though the property in question is a painting or other tangible article for which a

complete relinquishment of ownership and dominion would be required if the donor intended to give absolute ownership to the donee.

In other jurisdictions gift transactions have been upheld even though the donor expressly made reservations for his own benefit consistent with some of the rights or privileges of an owner, or retained dominion over the property in some degree. *In re Dayton's Estate,* 121 *Neb.* 402, 237 *N. W.* 303 *(Sup. Ct.* 1931); *In re Corn's Estate,* 141 *N. Y. S.* 2d 16 *(Surr. Ct.* 1955); *Connelly v. Bank of America National T. & S. Assn.,* 138 *Cal. App.* 2d 303, 291 *P.* 2d 501 (1956); *Smith v. Acorn,* 32 *A.* 2d 252 *(D. C. Mun. Ct. App.* 1943); *Arizona Title Guarantee & Trust Co. v. Wagner,* 75 *Ariz.* 82, 251 *P.* 2d 897 *(Sup. Ct.* 1952); *Smith v. Smith,* 253 *F.* 2d 614 (4 *Cir.* 1958). These cases are cited not as precedents which are fully applicable here, but rather to show that there is judicial authority for the proposition that incidents of ownership may be retained by a donor without destroying the effectiveness of an intended gift. It may be said that our own cases dealing with joint bank accounts support the same proposition. One who has opened a joint account with his own money has been held to have made an effective gift to the other person whose name appears on the bank's records as co-owner. This is so in spite of the power of the donor of the deposit to withdraw at all times the full balance from the account. *Steinmetz v. Steinmetz,* 130 *N. J. Eq.* 176 *(Ch.* 1941); *Goc v. Goc,* 133 *N. J. Eq.* 206 *(Ch.* 1943); *Farris v. Farris Engineering Corp., supra,* 7 *N. J.,* at *pp.* 501–502.

■ One who intends a gift may avoid all requirements relating to delivery of the property to be donated by executing and delivering a formal deed of gift. *Meyers v. Meyers,* 99 *N. J. Eq.* 560 *(Ch.* 1926); *Tarbox v. Grant,* 56 *N. J. Eq.* 199 *(Ch.* 1898); *Hebrew University Ass'n v. Nye, supra.* That is not the only method, however, by which one can make a donation which is subject to retained rights of enjoyment. No deeds of gift were involved in any of the cases cited in preceding paragraphs, but as already noted, gifts were upheld in

spite of elements of ownership being retained by the donors. Does a deed of gift under seal do more than indicate a deliberate and unequivocal expression of intent? I think not, although the historical significance of such a document must be conceded. Here Mrs. Dodge's donative intent was expressed in the letter of May 16, 1961. The letter itself and the sequence of events leading up to its signing show that she acted with deliberation in deciding what she wanted to do and in doing it.

Recent decisions in a related field—testamentary dispositions—have placed great emphasis upon carrying out intent which has been properly proven and accordingly have minimized or eliminated the significance of documentary formalities which, if they had been observed, would have made the intended dispositions effective beyond question. *In re Cook's Estate,* 44 *N. J.* 1 (1965); *Fidelity Union Trust Co. v. Robert,* 36 *N. J.* 561 (1962); *Bank of New York v. Black,* 26 *N. J.* 276 (1958). These testamentary decisions have particular relevance to this case because the tragic mental incompetence of old age has left Mrs. Dodge with no more power to reaffirm her intent, or perform further acts in relation to the art collection, than a decedent has to change or supplement his will.

My conclusion is that Mrs. Dodge on May 16, 1961 gave to Elmira College her entire collection of paintings, pictures, jade, bronze and objects of art, subject to her right to retain all or any part of the items as long as she might be able to enjoy them. This conclusion leads to the question of immediate delivery. Except for the shipment of bronzes early in 1962, there is no indication in the record that Mrs. Dodge ever decided to send to Elmira any part of her gift. She has no capacity to decide now. But the proofs about her condition make it plain she will never again use her house in New York and so cannot enjoy what is there. All articles included in the gift and located in the New York house should be sent to the college as soon as appropriate arrangements for packing and shipping can be made and carried out. The same pro-

gram is to be followed with items now in storage. The college is emphatic about its desire to have no changes made now which could possibly infringe upon Mrs. Dodge's enjoyment and use of her home at Giralda Farms where she is being cared for. No part of the gift in that home, unless in an obvious storage place, shall be removed while she lives.

One word in the letter of May 16, 1961 calls for a minor comment. The word is "jade." Unless the guardians have overlooked something, there are so few pieces of jade, or pieces in which jade is incorporated, that they cannot be described as a collection. Apparently a mistake was made, but I think it unimportant. It does not indicate the letter had only superficial consideration before it was signed. My judgment is that the question Mrs. Dodge thought of prior to May 16 was whether to give, or not to give, her art to the college. That broad question very likely pushed into the background details of description.

 It will be obvious that my inquiry about a gift has been guided by and addressed to New Jersey law. Approximately 70% in value of the Dodge collection is at Madison and was there on May 16, 1961. The remaining 30% is and was at the New York City house. The transaction of gift was, of course, a single one, encompassing both the New Jersey and New York articles. In the transaction all the articles were treated as a unit, a "collection." Distinctions were not drawn between what was in New York and what was in New Jersey. It seems appropriate that the law of New Jersey, the state where the collection was concentrated and where Mrs. Dodge had her home, should govern. At least a suggestion to that effect is to be found in the caveat to *section 256, Restatement, Conflicts of Laws, pp.* 339-340 (1934) If, however, New York law is to furnish the test for the property located in that state, the letter of May 16 is sufficient, without delivery of any of the articles, to establish a gift to the college. New York, unlike many other jurisdictions, has treated letters and informal memoranda containing statements of intent to make a gift *in praesenti* of personal property, as the

equivalent of deeds of gift under seal. Annotations, 63 *A. L. R.* 537, at *p.* 552 (1929), and 48 *A. L. R. 2d* 1405, at *p.* 1414 (1956).

The decision that a gift was made eliminates any need to pass upon the college's alternative argument for a binding agreement to make a gift. Should there be an appeal it may be useful, however, to have the salient facts relating to that argument stated.

In June 1960, when Mrs. Dodge pledged payment of $250,-000 to the college, there was a plan to erect a new building for displaying art objects. The plan was not developed in any detail. A month or so earlier Mrs. Dodge had sent to the college more than 200 antique Chinese porcelains.

When she visited Elmira in June 1960 she was shown "Strathmont." What she saw was a large mansion set in spacious grounds. It had ceased to be a private home and had been used, rather unsuccessfully, as a museum. She wrote to Dr. Murray on June 20 commenting upon the beauty of Strathmont and expressing hope that it "will soon be in your hands as it would seem that there would be great possibilities for you with all that beautiful land and mansion and that there would be ample room for many varied activities." No mention was made at this time of any plan to make Strathmont an art center for the college. On August 12, 1960 Dr. Murray sent to Mrs. Dodge plot plans of the campus and of the Strathmont estate, and in his letter suggested a possible site for the Dodge building on the campus.

In February 1961 the college got title to Strathmont. It had been known for some weeks or months previously that this would be accomplished. Apparently no purchase price was paid, but in any event no money contributed or pledged by Mrs. Dodge was used in the acquisition.

The certainty of getting Strathmonth led to the gradual formation of plans to use it as an art museum for the college and to house related activities. Dr. Murray's letter of December 13, 1960 to Mrs. Dodge, mentioning Strathmont as a home for "your tremendous collection of various art objects,"

has been referred to earlier in another connection. Another letter of his to her is dated May 23, 1961. In it he thanked her profusely for her letter of gift dated May 16 and then went on to express the hope that she could visit the college in June and while there "talk concretely about the Geraldine R. Dodge Center which we now call Strathmont." The hoped-for visit did not occur, but on June 5, 1961 formal action was taken by the college to rename Strathmont the "Geraldine R. Dodge Center."

In January 1961 the college had floor plans of the Strathmont house prepared by architects for the purpose of showing possible arrangements for galleries and exhibition rooms and placement of display cases. A set of these was sent to Mrs. Dodge. Two drawings showing details of display cases for art objects also were procured by the college and sent to Mrs. Dodge. These are dated October 1961. In addition, there was discussion between Mr. McGraw and Mrs. Dodge, at their fairly frequent meetings, about alterations to Strathmont to make it suitable for use as a museum to display Dodge art.

I am satisfied Mrs. Dodge knew of the plan to use Strathmont to house the collection she had stated she would give to the college. She apparently raised no questions about that use —with the possible exception of the Sayres letter of October 31, 1961, mentioned above; and she certainly expressed no disapproval. In its planning for Strathmont as an art center, the college was counting upon the ultimate delivery of the collection, and Mrs. Dodge knew this. The attitude of the college was not pure reliance. It was reliance mixed with a desire to make plans and take steps which would indicate progress to a benefactor and keep her interest alive and perhaps encourage additional gifts. Incidentally, there was in June 1962 a contribution of $25,000 toward the building program then being carried on for the college as a whole.

The college has held the Geraldine R. Dodge Center (formerly Strathmont) available to house the Dodge collection. The property might have been put to good use for other purposes, but only after alterations. Dr. Murray testified that the

trustees, especially their executive committee, seriously considered housing for students, a music school and faculty apartments, but rejected each of these possibilities because of the art objects to come from Mrs. Dodge. Between June 1960 and June 1964 the college spent about $57,000 to maintain the property. In the same period the income on the Dodge fund of $250,000 was approximately $30,000. That capital fund has been kept segregated. It will be needed to pay for alterations at the Dodge Center which will create a suitable museum and home for the art department.

Dr. Murray also testified that considerable attention was devoted to the curriculum and faculty of the fine arts department in order to be in a position to take advantage of the Dodge collection. To some extent things done in this field were reported to Mrs. Dodge, who approved of them. Gifts of pictures from other owners were solicited and in some cases obtained, this being done to get examples which would supplement the art to be received from Mrs. Dodge.

In summary, the college, with Mrs. Dodge's knowledge, has relied upon receiving in due course the entire Dodge art collection. Motivated to a substantial extent by that reliance, it has incurred some expenses for plans and maintenance, has held available a building which could have been assigned another role, and has devoted time and effort of its executives, administrators and faculty to planning and preparing for the housing and use of the collection.