50 N.J. 192 (1967)
234 A.2d 65
IN THE MATTER OF GERALDINE R. DODGE, AN ALLEGED MENTAL INCOMPETENT.
ELMIRA COLLEGE, PLAINTIFF-RESPONDENT,
v.
FIDELITY UNION TRUST COMPANY, ET AL., AS SUBSTITUTED GUARDIANS, ETC., DEFENDANTS-APPELLANTS.
The Supreme Court of New Jersey.
Argued February 21 and March 6, 1967.
Decided June 20, 1967.
*196 Mr. Emory C. Risley argued the cause for defendants-appellants (Messrs. Stryker, Tams & Dill, attorneys; Mr. Barry A. Osmun, on the brief).
Mr. Donald B. Kipp argued the cause for plaintiff-respondent (Messrs. Pitney, Hardin & Kipp, attorneys; Messrs. Clyde A. Szuch and Joel A. Wolff, on the brief).
The opinion of the court was delivered by FRANCIS, J.
The Superior Court, Chancery Division, held that by a letter dated May 16, 1961, Geraldine R. Dodge (Mrs. M. Hartley Dodge) made an effective gift of her art collection to plaintiff Elmira College, Elmira, New York. The collection has since been valued at slightly under $1,700,000. This appeal followed and we certified it before argument in the Appellate Division. Our review of the record satisfies us the alleged gift was not adequately established, and therefore we reverse.
Mrs. Dodge was adjudged a mental incompetent on June 18, 1963, and her husband, Marcellus Hartley Dodge, was appointed guardian of her person and property. Subsequently Dodge died, and Peter C. Netland and Fidelity Union Trust Company were substituted as guardians. She was 81 years of age at the time of the incompetency hearing. Her mental incapacity was caused by a generalized arteriosclerosis which involved the cerebral vessels of the cortex of the brain. One neurologist described it as cerebral arteriosclerosis with senile and arteriosclerotic dementia. The psychiatric condition was characterized by memory defect, disorientation, confusion and mental tension disorder, due to physiological changes associated with her advancing years and the gradual progression of the sclerosis. The condition was chronic, progressive and irreversible. Except for the brain syndrome associated with the cerebral arteriosclerosis, her general physical condition and appearance were said to be excellent.
*197 Dr. Harry E. Gilliand, a Madison physician who had been taking care of Mrs. Dodge on and off since 1929, testified in the proceeding below. He agreed substantially with the diagnosis of the physicians who appeared in the incompetency hearing, that her mental condition is the result of a long, progressive deterioration. He noticed a change in her personality gradually following the death of Raymond Patterson, who had been her business manager and confidential assistant for many years. Patterson died in February 1960. "From then on and in * * * late 1961 or '62, then we were pretty sure that the things we had been seeing and were suspicious of definitely were facts." He could not fix a precise date, but somewhere in May-July 1962, "the changes were so pronounced that you couldn't help but recognize them and realize something was amiss." Another witness, Miss Mary Jane Ellis, had known Mrs. Dodge since February 1937. In September 1958 she came to live at "Giralda," the Dodge home in Madison, N.J., as a companion and general helper in Mrs. Dodge's affairs. She helped with her papers, her art collection; she "did a little bit of everything," and obviously was in regular and close contact with Mrs. Dodge. In July 1961 Miss Ellis, in company with Mrs. Dodge, had lunch with Dr. J. Ralph Murray, the President of Elmira College, and his wife. Some discussion occurred about shipment of certain art objects to the College, and Dr. Murray suggested that Mrs. Dodge come up to Elmira and bring Miss Ellis with her. In this connection Miss Ellis testified that she took Dr. Murray aside and told him it was not the thing to do, that "Mrs. Dodge had changed or was changing and that she needed to be the center of attention and just to please leave me out of things." Dr. Murray replied, "Yes, we have noticed that; that's why we want to get her up there before it's too late." Harold W. McGraw, the principal witness for the College and the person who obtained the alleged gift letter of May 16, 1961, conceded that about that time, Mrs. Dodge "was showing signs of considerable forgetfulness." Shortly *198 thereafter he remarked about it in some of his reports to the College. The condition noticeably worsened because on February 28, 1962, in a "Personal and Confidential" report to his principal collaborators in seeking gifts from Mrs. Dodge, he said: "I had dinner with Mrs. Dodge last night. She is certainly confused and apparently the one who talks to her last holds the inside track."
Our motive in reviewing, at the outset of this opinion, the testimony dealing with Mrs. Dodge's mental condition is not to indicate that the proof sufficiently shows incapacity to make a gift on May 16, 1961. The purpose is to project, as a proper backdrop for the evaluation of the evidence in the case, the fact that this elderly lady  over 79 years of age at the time of the extremely valuable and momentous gift, quite obviously larger than any she had ever given before  had a gradually progressive, insidious arteriosclerosis which apparently was not affecting her physical appearance, but which was lowering her mental acuity and moving her toward incapacity to handle her very substantial affairs.

I
The saga of Mrs. Dodge's alleged gift of her valuable art collection begins in 1954. At that time Elmira College, a private liberal arts college located at Elmira, New York, was in financial straits. Dr. J. Ralph Murray became its president on July 1, 1954. Before accepting the post he recognized, as did the board of trustees, that the procurement of substantial funds was mandatory "if the institution was to stay alive." It was understood that a maximum amount of his time would be spent in fund raising, that this objective would be his responsibility, and that the trustees would join him in fulfilling that responsibility. On the basis of the record before us, there seems to be little doubt that under Dr. Murray's leadership and that of a reconstructed and reinvigorated board of trustees, the combined effort resulted in very substantial improvement in all aspects of the College's condition and operation.
*199 The other members of the board of trustees of the College who played principal roles in stimulating the alleged Dodge gift must be mentioned. Harold W. McGraw, who is vice-president of the McGraw-Hill Publishing Company, had been a trustee for about 10 years prior to this hearing, and president of the board since 1957. Perry M. Shoemaker, president of the Central Railroad Company of New Jersey when he appeared as a witness in these proceedings, had been a member of Elmira's board of trustees both before and after the events under review. Both men were aware of the College's need for funds and were interested in raising them. According to Dr. Murray, when McGraw first came to the board he understood that "one of his fundamental purposes was raising funds."
According to McGraw the trustees spent "a great deal of time figuring out" how they were going to get the money needed by the College. Among other things they selected individuals to be solicited; one of them was Mrs. Dodge. McGraw was born and raised in Madison, N.J., where the large Dodge estate known as "Giralda" is located. McGraw knew Mrs. Dodge slightly in 1954, and was aware of her reputation as a very wealthy woman. Shoemaker had lived in Summit, N.J. from 1945 until late in 1960. When he became associated with the Lackawanna Railroad in 1941, Mrs. Dodge's husband, Marcellus Hartley Dodge, was a director of the company, and there is no doubt that a friendship grew up which continued over the years. Shoemaker was a member of the board of Overlook Hospital in Summit, and around 1956, after discussing the matter with Mr. Dodge, he met Mrs. Dodge and obtained a $20,000 contribution from her for the hospital.
McGraw had known Raymond Patterson, Mrs. Dodge's manager, intimately since the 1920's. Both were members of the New York Athletic Club (where McGraw resided at the time of this hearing; for how many years he had been there does not appear), and they saw each other frequently. McGraw began to talk with Patterson about Elmira College, *200 its financial straits, and the possibility of interesting Mrs. Dodge in helping. Thereafter Patterson arranged meetings between her and McGraw, and always attended them until his death in February 1960.
According to Dr. Murray the understanding was that if McGraw succeeded in interesting Mrs. Dodge in Elmira College, an effort would be made to obtain an appointment for him to meet her. In May 1955, McGraw reported that he had had one meeting with her and felt he had gained her interest in the College. By mid-November he advised Dr. Murray that he had spoken to Patterson several times concerning the possibility that Elmira might give Mrs. Dodge an honorary degree, in return for which "she might make a large gift that will place the college in a sound financial position." Commenting again some time later about this suggested degree, and after it had been approved by the board of trustees, McGraw wrote "I will admit that we are putting the cart before the horse in handling this situation. On the other hand, I am confident that it will pay dividends in the very near future." At this time Mrs. Dodge had made no contributions nor did she have any connections, family or otherwise, with Elmira College; and the record gives no intimation that recognition of any achievement of hers in public or private life provided the motive for the degree. The quid pro quo was intended to be a substantial monetary gift. Such bargain and sale treatment is not likely to add lustre to the prestigious reputation of honorary doctorates. Although the degree was tendered on two or three occasions Mrs. Dodge did not rush to receive it. It was not until about three and one-half years later that it was bestowed physically on her at a private ceremony.
Some time in 1956 or early 1957, McGraw arranged a meeting for lunch in New York so that Dr. Murray could meet Mrs. Dodge. As has been said above, this was in accordance with the planned approach to her. Dr. Murray had prepared carefully for such a meeting. He had gone *201 to the New York Public Library and obtained biographical data about the Rockefeller family (Mrs. Dodge's father was William Rockefeller); he read an article about the Rockefeller family entitled "They Were Born to Give," which had appeared in Reader's Digest; he looked at material in a file maintained in New York City by the Financial Council in Aid to Education; he inquired about Mrs. Dodge among people in the educational world, who were concerned with fund raising; and other information was obtained from Standard & Poor's. As the Doctor put it, he had studied her and the Rockefeller pattern of giving. His intention was to seek a very large gift of money from her, and he wished to be very careful about handling her properly.
From the time of this meeting with Mrs. Dodge, the campaign for a large contribution was on in earnest. On the one side were Dr. Murray, McGraw and Shoemaker, all able and knowledgeable men; on the other was Mrs. Dodge, an elderly lady, who seemed to have no close friends, and who rarely had friends or associates visit her, either at her principal home in Madison, N.J. or at her Fifth Avenue residence in New York City, where she usually spent Tuesday through Thursday. Dr. Murray described her as shy, "almost a recluse," and a person who did not like crowds. In fact she would postpone her regular visit to the City if a parade was to be held there. (Mrs. Dodge's letter of August 15, 1960 to Dr. Murray gives an insight into this attitude. She told him she had to straighten out some banking matters with the Hanover Bank and "it has caused a great many problems with us because I am not at all in favor of the new banks and their architecture. Most of those in New York are all glass and nobody has any privacy and everybody can see what is going on at all times.")
According to Miss Ellis, her Giralda home companion and helper, she rarely entertained; occasionally she had an overnight visitor. "Mostly" she was there "just with" Miss Ellis. She and her husband lived substantially separate lives. Only one child had been born of their marriage; he died *202 in an accident many years before the events under discussion. Her nearest relatives were some nephews and nieces, whom she rarely saw. Her husband was a man of considerable wealth and devoted himself, with the aid of a business manager, to the handling of his own affairs. She managed her great wealth independently, with the assistance of Raymond Patterson as her general manager and confidential assistant. It is undisputed that she relied heavily on Patterson. McGraw conceded that Patterson had her confidence and that if he "felt well of an idea, it generally went through." Writing to Dr. Murray on July 23, 1958, McGraw said "From the way Pat spoke he is in the frame of mind of a sizable donation and keep in mind that Pat holds the purse strings." McGraw testified that Patterson's death in February 1960 had a "strong effect" on Mrs. Dodge; he described it as "like losing her right arm." Thereafter, throughout the crucial period up to and including May 16, 1961, when the alleged art collection gift letter was signed by her, and for a number of months thereafter, she had no general manager and, so far as the evidence reveals, no advisor to whom she turned for financial advice.
After the death of Patterson, in the pursuit of gifts to the College, the advantage was with McGraw, Dr. Murray and Shoemaker, and it was never allowed to escape. It is clear from the mass of correspondence among them that there was no intention to cultivate Mrs. Dodge because of any interest in her as a person, or for social reasons. In the stream of almost-weekly reports from McGraw to the other two men (marked "personal and confidential"), relating to his many luncheon and dinner meetings with her, the singleness of their donation-seeking purpose is grossly apparent; we rarely find a kind word or a note of solicitude about her as a person, unless a reference to the fact which had drawn them to her, i.e., that she was civic minded and had done a great deal of good with her money, can be so considered. The McGraw attitude may be illustrated by reference to two of his reports, one before the alleged art collection gift *203 and the other thereafter when the focus was again on cash gifts.
The January 29, 1959 report of a two-hour luncheon with Mrs. Dodge and her manager Patterson said it was important for the triumvirate to "give a considerable amount of time to getting funds from Mrs. Dodge," that she is one of the ten wealthiest women in the country, with only "two nieces to leave her money to and they are hanging around for her to pass on. Also keep in mind that she is over 85 [sic] years old and at that age anything can happen. For this reason I think we must lay our ground work in order to get her gift or gifts by June of this year. In the next two or three weeks I think that the three of us should have a visit here in New York on this subject." The report concluded:
"The luncheon is now over in the little restaurant on 46th Street. [This is the restaurant frequented by Mrs. Dodge.] The tables are old, the chairs are very uncomfortable and it is necessary to do handsprings in order to get out of the place. Her Cadillac limousine is in Madison but the taxi she always uses was at the door and in it we all drove away." (Insertion ours.)
In a later report to Dr. Murray and Shoemaker about six months after the alleged gifts, also marked "personal and confidential," McGraw wrote:
"I am having dinner with Mrs. Dodge again next Tuesday, January 2 at Buscaglia. The seats at that restaurant are getting very hard and I hope we can do a good job the latter part of January so that we can take a few weeks off here in New York."
Dr. and Mrs. Murray also had had dinner with Mrs. Dodge at Buscaglia's. Dr. Murray's letter to her shortly before McGraw's first comment about the place presents an interesting contrast. He said "Sometime I should get you to recommend a list of restaurants in New York because each time we have had dinner with you the restaurant has been better than those we seem to find in New York City."
*204 After the May 1955 meeting with Mrs. Dodge that Patterson had arranged, McGraw saw her at intervals until Patterson died in February 1960. The meetings were usually for lunch or dinner at Buscaglia's, the New York restaurant Mrs. Dodge had frequented almost weekly for many years. Patterson was always present. McGraw attempted to interest her in Elmira College's financial condition with the possibility of cash contributions in mind. In April 1957 she visited Elmira with Patterson. The trip was planned by McGraw; Shoemaker had his private Lackawanna Railroad car pick her up and return her to the Madison station. Both men made the trip with her and Patterson to Elmira. While there she was entertained by Dr. and Mrs. Murray; she met the trustees and toured the College and grounds. Her letters thereafter showed she enjoyed the visit and the company of the Murrays, McGraw and Shoemaker.
Up to this time Mrs. Dodge had made no contributions to the College. Shortly thereafter, she gave $30,000 in cash or securities. Visits to Giralda by the fund-raisers followed, as well as lunches and dinners in New York, and she obviously appreciated the effusive friendship they gave her. McGraw, however, remained the active agent in the campaign and he continued to have dinner meetings with her at Buscaglia's. As these meetings progressed she began to discuss donating some of her art collection. In September 1958 McGraw wrote Murray about "a special gift," and said it would include a jade collection "which she and Pat claim is the finest in the world." Unfortunately Patterson is dead and the statement attributed to him cannot be verified. It seems obvious, however, that there was and is no jade collection.
At this point a word should be said about the art collection. It consisted of hundreds of art objects, such as paintings, bronzes and antique Chinese porcelains. They were on display and in storage in the main residence at Giralda Farms; some were stored in the Dunham and West houses at Giralda Farms; some were on display at the 800 Fifth *205 Avenue home; others were in storage there. No part of the collection was in public warehouse storage. The art collection had been catalogued carefully in five large ledgers in 1946 by Miss Josephine Z. Rine, a writer and editor who was engaged for that purpose by Mrs. Dodge, and she kept the records current after that time. Each article was numbered and described and any disposition of an article was entered. No jade collection was listed and Mrs. Dodge never mentioned any such collection to her. Miss Ellis, Mrs. Dodge's constant companion, who helped her with the art collection and also assisted Miss Rine in her work, said there never was any mention of a jade collection, she never saw any such collection, and except for a few pieces of jade, such as an ashtray, there was no jade around. Moreover, after the declaration of incompetency a thorough search at Giralda and the Fifth Avenue residence by the guardians, in order to have the art collection appraised, disclosed no jade of consequence. According to Miss Rine, Mrs. Dodge loved her art objects; they were "like children" to her. It seems unlikely that such a person would knowingly talk about making a gift of a non-existent jade collection.
In the period following Mrs. Dodge's visit to the College and before Patterson died, McGraw pursued the subject of her art collection. He indicated in his testimony that in his view by September 1958 she had made a gift of her entire art collection to Elmira  in her own mind and in his. But the letters between Dr. Murray and Mrs. Dodge, as well as McGraw's "personal and confidential" reports to Dr. Murray and Shoemaker, indicate otherwise. They speak of the gift she is "planning"; that she is giving "some of [her] wonderful art objects to Elmira College"; McGraw's discussion with her about "her gift of jade, china, bric-a-brac, etc." which "is going forward"; about the need for a special building "to house this gift plus any additional gifts that we receive at a later date," and that, "with this program under way, I [McGraw] believe that additional art objects that are now in storage, in her Fifth Avenue home and in Madison, *206 will be given to the college"; her letter to McGraw of October 25, 1958 saying, "As soon as the Christmas season is over, I hope to be able to make arrangements for sending along the porcelains to Elmira"; her letter over seven months later to Dr. Murray, saying she had been looking "over some of her porcelains" and inquiring if he had "ever gone further in regard to plans for the porcelains"; Murray's reply a week later saying that considerable thought had been given to "the art objects," and inquiring as to what arrangements she would "like to be made for the two cases you sent us to see in your Madison Avenue [sic] house." About this time, July 23, 1959, Dr. Murray inquired of an architect about preparing a "preliminary sketch of a potential building" with about 5000 square feet of space in it including a "couple of nice display rooms" to house the collection of jade and porcelain odd objects which Mrs. Dodge has given to Elmira College. Dr. Murray could not have had in mind a building to house the entire Dodge art collection, which literally cluttered up Giralda and the Fifth Avenue residence, to say nothing of the storage places. Moreover, in referring to the jade and porcelain odd objects as having been given, the doctor projects the thinking that characterizes McGraw's attitude, namely that of confusing the intention to make a gift or gifts with the actual making thereof; of assuming the deed when only the will for the deed had been expressed. No jade was ever donated to the College; the porcelains were not delivered until May 10, 1960, almost a year later, when with Shoemaker's assistance, 216 items were shipped by Mrs. Dodge. In this connection it should be noted that the porcelains had been stored in the Giralda cellar for years. When they were brought out Mrs. Dodge selected the objects she wished to keep. The objects given were appraised at $48,055. The ones retained were returned to the cellar and are listed in the incompetency proceedings' appraisal at $23,530. At the end of June 1960, after the porcelains were delivered to Elmira, McGraw wrote to another trustee saying that Mrs. *207 Dodge had given certain art objects and "has promised to give additional pieces from her vast collection."
Returning to the period of Patterson's association with the Elmira campaign as advisor to Mrs. Dodge, it appears that toward the end of 1959 she made a second cash gift of $20,000. There were no further contributions, monetary or otherwise, before his death in February 1960. Thus during the almost five years of McGraw's pursuit of her, while Patterson was guiding her, the total gifts amounted to about $50,000. After Patterson's passing, the McGraw campaign took on a markedly increased tempo. He began to have weekly meetings with her, usually for dinner at Buscaglia's restaurant.
In June 1960 Mrs. Dodge agreed to visit the College. The private Lackawanna Railroad car facilitated the trip. There she was agreeably surprised by the conference at a private ceremony of an honorary degree of Doctor of Humane Letters, honoris causa.
While she was at Elmira, the trustees by resolution accepted property known as Strathmont as a gift. It is located about seven blocks from the campus and consisted of about 16 acres on which were located a large main residence and several outbuildings. The property was owned by a charitable trust and had been used unsuccessfully as a public museum. At that time the College had no plan to use it for any particular purpose. Mrs. Dodge was shown Strathmont, and on returning home wrote Dr. Murray thanking him and his wife for their "great hospitality" and for the degree, and praising the beautiful Strathmont property with its ample room for "many varied activities." McGraw reported later that she told him she had fallen in love with the property and could see tremendous possibilities in developing it for the College.
The day after the short stay at Elmira, Dr. Murray wrote McGraw saying that the day and a half he (McGraw) spent with Mrs. Dodge there "was about as near perfect as possible." He said also:
*208 "I am always amazed at how adept you are in making a pertinent comment at the propitious moment such as you did when we were sitting in the Art Gallery at the Watson Building yesterday talking about the display cases and the need for additional space.
As far as I am concerned, the respective roles each of us played produced the best course of action."
The letter said further:
"* * * If our good fortune holds through Tuesday evening, maybe the accompanying piece of paper will bear fruitful significance of the long hours and tremendous energy you have used in the college's behalf with our good Friend."
On Tuesday, June 21 and 28, 1960, McGraw had dinner with Mrs. Dodge alone in New York and spent about three hours on each occasion talking with her "about the needs of the College and what she could best do to take an active part and be of real help." Among other things they discussed the erection of a building to house "all art objects that have been given or may be given in the future." He happened to have with him a pledge card form which he produced. Obviously it was the "accompanying piece of paper" Dr. Murray had sent him. She signed the card pledging to pay $250,000 over a five-year period. McGraw wrote on the back of the card:
"This fund of $250,000 is to be used to erect a building to house all art objects that I have given and may give in the future  to be known as the Geraldine R. Dodge Building."
This $250,000 was five times the total of her gifts to Elmira during the years Patterson accompanied her to the meetings with McGraw.
In sending the pledge card to Dr. Murray and reporting his success with Mrs. Dodge to him and Shoemaker, he said among other things that she "is very much interested in giving more art objects to the College." He reported also that "she was most enthusiastic about becoming a member of the Board [of Trustees], provided she is elected." It is odd that in July 1960 she was "enthusiastic" about becoming a *209 member of the board. McGraw had suggested such membership to her by letter on November 30, 1959, less than three months before Patterson's death. She had declined saying "I do not feel that I have the time and strength to give to such a responsibility." Her letter, as it appears in the appendix, is dated May 10, 1962, although it refers to McGraw's "letter of the 30th" and to its subject matter. In September 1960, Dr. Murray officially invited her to become a member of the Board of Trustees. The record contains no answer to the invitation. Dr. Murray testified that she was appointed to the board in June 1961; he notified her by telephone. She never attended a meeting; in fact she never again returned to the College after the visit of June 1960, although importuned to do so, and after making and breaking dates for visits. The board began to send minutes of its meetings to her. Apparently, however, the full minutes were not always sent. In April 1962 an excerpt was delivered to her by McGraw, but only after the portion of the minutes covered therein had been "rewritten to strengthen them a little bit" at Shoemaker's suggestion.
Two weeks after the pledge card incident, McGraw again reported to Dr. Murray about spending over three hours with her at Buscaglia's. During that time "she had two double Canadian Club on the rocks and I had two Scotch and sodas. I did not push her for anything because I pushed her so hard two weeks ago." A few days later Dr. Murray wrote Mrs. Dodge telling her that he and Mrs. Murray had had a thoroughly enjoyable evening at Giralda with her, Mr. Dodge and Mary Jane Ellis. (This was one of many meetings the Murrays had with her after the first occasion in 1956 or early 1957; apparently most of them were dinner or lunch meetings in New York.) He told her also that he and Mrs. Murray commented, on the way back to Short Hills, "that it was difficult to reach into our past and visualize a time when we were not friends. It has been so easy to develop a very warm feeling for you that it seems as if it has always been in existence."
*210 It is obvious from further parts of this letter that there was then no plan to house art objects in the Strathmont building. The focus was on the envisioned "Geraldine R. Dodge Building" to house them "on the campus." In September 1960 a check for $100,000 in part payment of the $250,000 pledge was sent to Dr. Murray with Mrs. Dodge's notation "that this amount is to be held for the proposed building." Six days after this payment the board of trustees had a meeting, and the minutes thereof contain some odd statements about the use of her money:
"The Executive Committee discussed at some length various programs for a building to be built with the money Mrs. Dodge has pledged with the thought that flexibility was needed in any discussion with her in order that ample information could be gained in sufficient time available so that the net results of her gift could be used to the best advantage for the development of the college. It was agreed that on her trip to Elmira in the immediate future that if she named an architect he would work with her in developing the building in accordance with the number and kinds of objects that might be housed in the building."
As noted above she never returned to the College after the June 1960 visit.
In November 1960, McGraw's personal and confidential reports of his weekly dinner meetings began to speak of more ambitious projects. It is interesting to note an almost military style about them, i.e.:
 "Personal & Confidential.
 Report to: Dr. J. Ralph Murray
 From: Harold W. McGraw
 Copy to: Mr. Perry M. Shoemaker
 Subject: Mrs. Geraldine R. Dodge."
On November 16 he reported one of the most satisfactory meetings "we have ever had. As you might imagine, we spent the entire evening talking about gifts of all types and primarily gifts to Elmira College." He advised that Mrs. Dodge was very much interested in getting Dr. Murray's report regarding Fairleigh Dickinson College, which (he *211 said) "should not be in writing but a verbal report when you next get together * * *. There will be no more gifts to Fairleigh Dickinson College, The Madison, New Jersey YMCA and other organizations in that immediate vicinity. Apparently, they do not know how to handle her."
He reported that they had discussed her finances at length. She said she had no one to leave her money to except "two nieces that she claims are waiting around for her to die. Therefore, she is thinking very seriously about other gifts to Elmira College. I am confident that in 1961, we will get a minimum pledge of $500,000 and it could easily go to two, three or four times this amount." In that connection, he was going to ask Dr. Murray and his wife to help "in this direction during the next couple of months." Then he noted: "For the first time, she seems to be feeling as if she is getting old and wants to do the things she has in mind and get them set quickly. This is sound policy for us." The report concluded by referring to all the art objects still to come to the College and requesting Shoemaker to help, because "he can handle this phase with her better than anyone else."
The next report, twelve days later, suggests she is thinking of giving all her art objects to Elmira. This, said McGraw, "will run in the millions." Also, despite her earlier pledge of $250,000 to be used for a campus building to house the art objects she had given or might give in the future, he indicated she now was thinking of using the Strathmont main house for the purpose. McGraw told her he would like to consider renaming Strathmont to carry her name, and he advised his colleagues that it "seemed to please her greatly to have her name put up in lights." At his next meeting with her he arranged a dinner meeting at Buscaglia's for December 6, 1960 to be attended by Dr. and Mrs. Murray, Shoemaker and McGraw. A table had been reserved which McGraw hoped would be in "a quiet spot," and he suggested he would appreciate it if they would "visit with her concretely about moving" her art *212 objects to Elmira, including, of course, the display cases. He reported also that she had in mind "giving a great deal of cash and or stocks to Elmira College in order to help in the development of the Strathmont property. However, please handle this phase with kid gloves because it was on this point that the people in Madison got in trouble."
A week after the dinner meeting Dr. Murray wrote Mrs. Dodge exclaiming about the wonderful evening they had spent together. He told her also that they were "thrilled beyond expression to listen to the discussion about the possibilities of housing [her] tremendous collection of various art objects at Strathmont." He hoped she would visit Elmira soon and study Strathmont. In the meantime he and Berniece (his wife) were sending her a box of apples which he likewise hoped would add to her pleasures of the holiday season.
Discussions at the weekly dinner meetings between McGraw and Mrs. Dodge about her art collection and contributions for the redevelopment of Strathmont continued unabated for months thereafter. Unfortunately Mrs. Dodge did not and cannot testify as to precisely what her intentions were on either of these subjects. Careful scrutiny of the documentary evidence and the testimony, particularly McGraw's reports, therefore continues to be essential.
On January 4, 1961, McGraw reported to his colleagues about his dinner the previous evening with Mrs. Dodge. He had "every intention of getting her to sign a statement turning over all her art objects, paintings, etc. to Elmira College." But he "did not even request such a statement because the timing did not seem right." He had persuaded her to come to Elmira for the board meeting on Friday, January 27, and requested that Shoemaker provide his private railroad car for her, or at least make a special train stop at Madison to pick her up. Then the night before the board meeting McGraw, Shoemaker and Dr. Murray could have a talk with her about "her ideas" for the Strathmont development. He suggested that she was ready to allow shipment *213 of art objects to Elmira. He indicated that, when she inquired about the possible cost of improving Strathmont, by "pulling figures out of the air" he told her it "might cost in the neighborhood of one million dollars"  which "did not faze her one bit." In reply Dr. Murray wanted to know if she would talk about her collection; "will there be concern for all the potentialities or what? Some of the committee will very definitely have to be apprised beforehand else complications may arise." McGraw's response was that she was perfectly willing to have the gift of her art collection announced at the board meeting on January 28. He repeated that she had in mind giving another substantial gift after making the final payment of $50,000 on her $250,000 pledge. He did not want to push her for an additional pledge the previous evening, however, "because the time did not seem right."
Mrs. Dodge did not go to Elmira on the 28th. She became ill, according to McGraw, and her doctor "is making her take it a little slower." He advised also that a presentation that was to be made to her at a hospital in Morristown, N.J. had to be postponed because "she was not up to par." The board meeting was held at Elmira on January 28, in her absence. No public announcement was made about a gift of her art collection, nor did she thereafter consent to such an announcement, although there continued to be much pressure in that direction.
Following further dinners with McGraw, he reported that after making and breaking a previous date, Mrs. Dodge had agreed to meet with him, Dr. and Mrs. Murray and Shoemaker, at her home in Madison on March 27, 1961  but not for dinner. The principal purpose of this meeting was to enable McGraw's photographer to take pictures of the art collection on display at Giralda. His colleagues agreed that they would be potent publicity for the College when an announcement of the gift was authorized. McGraw had dinner with her before the 27th. In his letter to Dr. Murray discussing it, he said "we went over most of the ground that *214 we have covered many times before * * *. She did not mention the fact that she had lunch with Berniece and I did not mention it either." With respect to the Madison meeting on the 27th, he said, "You never can tell when she may decide to change the date."
The meeting at Giralda was held on March 27 and photographs were taken of many paintings and art objects which practically covered the walls, filled the many cabinets and display cases, and rested on the floors, pedestals, tables and other places around Giralda. Mrs. Dodge appears in most of them. But she never authorized their use to publicize a gift of her art collection to the College.
Reference should be made again at this point in the narration of facts to the testimony of Miss Ellis, Mrs. Dodge's companion. (It should be noted also that our close reading has convinced us that her statements are thoroughly reliable and her credibility unimpeachable. No one in the case suggests otherwise.) It will be recalled that Mrs. Dodge completed a gift of porcelains by sending them to the College on May 10, 1960. Prior to that time and for many months thereafter Miss Ellis never heard any mention of a further gift of art objects to the College. In February 1961 Mrs. Dodge told her that Elmira College wanted her to give her art collection to the College and that "she was thinking about it." After that they talked about it when Miss Ellis drove her around Giralda in the afternoons. On these occasions she indicated she was still thinking about it. Originally she wanted to build "her own museum on her own place," but she was worried about the jetport coming to the area, and did not want to build if the port would be there. Miss Ellis remembered the dinner meeting at Giralda on March 27, 1961, when the Elmira people were there and all the photographs were taken. After that affair Mrs. Dodge told her she was going to give some of her art collection to Elmira from time to time.
Within a few days after this March meeting, apparently with Shoemaker's consent, McGraw obtained from Rowland *215 Davis, Jr., general counsel for the Erie Lackawanna Railroad Company, a form of proposed deed of gift to be executed by Mrs. Dodge. It was a formal document, employing the customary legal language to accomplish a gift of personalty; it contained a place for description of the property, a line for the signature of the donor, and a place for a seal. A form of acknowledgment before a notary public was included, which among other things stated that the donor fully understood the contents and effects of the deed. It is fairly inferable from the record that as soon as McGraw saw the formidable looking document he had serious doubts about the chances of persuading Mrs. Dodge to sign it. He thanked Davis for his letter "which gives me the tentative agreement which we hope will be signed by Mrs. Dodge. * * * I am in hopes that either this week or next I will be able to get her to sign this transfer." He never presented such a document to her for signature. The reason advanced in his testimony was that he thought it would require a listing of all the art objects in the collection, and that was too large an undertaking. When his attention was called to the fact that in the appropriate blank space the deed form simply said, "Describe the property," which was no more than what was done in the crucial April and May letters to be discussed hereafter, he testified that he did not "think of using it anyway."
On March 31, 1961, the day after the Davis letter containing the form of deed of gift, Dr. Murray wrote McGraw enclosing a form letter relating to the art collection. In the accompanying message he said the letter, "as you know, is not a legal document, but it might be worth something to us if we can secure Mrs. Dodge's signature on it." Murray wrote also to Shoemaker, telling him that the letter had been prepared and sent to McGraw "for her to sign which would give us some additional evidence of her intention." This letter has a very significant bearing on our conclusion, and therefore it is set forth in full:
*216 "April, 1961
Mr. Harold W. McGraw, Sr. Board of Trustees Elmira College Elmira, New York
Dear Mr. McGraw:
By this letter I wish to confirm the arrangements I have discussed with you concerning my paintings, pictures, jade, bronze, and various art objects, some of which are located at Fifth Avenue and 61st Street, New York City, at Giralda Farms in Madison, New Jersey, or in storage.
I wish to present these items, as a gift, to Elmira College, but to retain possession of them so long as I am able to enjoy them. I understand that the College has facilities available where these objects may be properly displayed and located, or will prepare such a display area for them. From time to time, I will relinquish possession of these items to the College as I desire.
It is my hope that the College, its students, alumnae and friends will receive the same benefit and enjoyment from these objects as I have been privileged to receive.
 Sincerely,
 (Mrs.) Geraldine R. Dodge"
It is not claimed by anyone in the case that this letter if signed by Mrs. Dodge would have established a valid present and completed gift.
The requisite elements of a valid inter vivos gift are well known. There must be (1) an unequivocal donative intent on the part of the donor; (2) an actual or symbolical delivery of the subject matter of the gift; and (3) an absolute and irrevocable relinquishment by the donor of ownership and dominion over the subject matter of the gift, at least to the extent practicable or possible, considering the nature of the articles to be given. Farris v. Farris Engineering Corp., 7 N.J. 487, 500-501 (1951). Proof of a general intent or desire or mere promise to make a gift, to be completed by delivery in one transaction of all the things to be given or by delivery of portions of them at intervals in the future, would not meet the conditions prescribed. Reiley v. Fulper, 93 N.J. Eq. 112, 115-117 (Ch. 1921); 24 Am. Jur., Gifts §§ 22, 23. The requirements of delivery and surrender of dominion and control are protective devices long since demanded *217 by the law in order to make certain that the donor clearly intended a gift and understood that the thing given was irretrievably gone.
Although there appears to be no case in New Jersey on the subject, there is considerable authority in other jurisdictions for the proposition that a valid inter vivos gift may be made by an instrument under seal signed by the donor, even where there is no physical delivery of the thing given. See Myers v. Myers, 99 N.J. Eq. 560 (Ch. 1926); Mechem, The Requirement of Delivery in Gifts of Chattels, 21 Ill. L. Rev. 569 (1927); 24 Am. Jur., supra § 33; and dissenting opinion, Foster v. Reiss, 18 N.J. 41, 56-57 (1955). Whether the same result should follow where there has been no delivery, and physical transfer is possible, but inconvenient, and the alleged gift is evidenced by an informal writing, such as the letter in this case, we need not decide for reasons which will appear hereafter. It may be noted, however, that if the requisite of donative intent appears, as well as surrender of ownership of the property, a persuasive argument may be made that absence of a seal on such a letter should not be regarded as requiring a refusal to recognize the gift. See, Foster v. Reiss, supra; Tarbox v. Grant, 56 N.J. Eq. 199, 204-205 (Ch. 1898); Speelman v. Pascal, 10 N.Y.2d 313, 222 N.Y.S.2d 324, 178 N.E.2d 723 (1961); 1 Scott on Trusts § 31, pp. 238-239 (2d Ed. 1956); Mechem, supra, 21 Ill. L. Rev. at 576-584; Annotation, 48 A.L.R.2d 1405, 1409-1416; but compare, Foster v. Reiss, 18 N.J. at 51 (majority opinion).
Returning to the factual stream, it appears that on April 3, 1961, McGraw had dinner with Mrs. Dodge. He brought with him the letter quoted above, concerning her art collection, but he "did not present it and ask her to sign it because" he "felt that it was a little premature." The "right track" was to "push her slowly." Two weeks later at dinner the situation was different. It was the "best meeting * * * in a long time." She was "tremendously enthusiastic" about transforming the main house at Strathmont into a museum *218 for her art objects. He showed her a set of plans for this, and told her it would cost at least a quarter of a million dollars. They also discussed other improvements to the Strathmont property, and he reported to Dr. Murray and Shoemaker that "It has not been definitely settled, but I have it in mind and so does she that the half million dollars for all improvements at Strathmont will be a gift from her." Then he "brought up the subject of her gift to the College of art objects, paintings, jade, etc., and I took out of my pocket the agreement which was prepared by Ralph Murray. I read this to her twice and she smiled and said that this was exactly the kind of an agreement that she wanted." (emphasis added.) She read it again and put it in her pocket book, telling McGraw she would sign it during the weekend and give it back to him at next week's dinner meeting on April 24. The report ended: "Keep your fingers crossed."
In the context of the whole case, the letter and the incident just described are probably the most influential in pointing the way to the just result. In light of the tests of a valid gift adverted to above, obviously that letter represents at most the existence of an inchoate intention to give an indefinite number of paintings, pictures, jade, bronze and various art objects, "some of which" are located in New York, Giralda Farms or in storage, at an indefinite time in the future, retaining possession of them in the meantime until she is no longer able to enjoy them. The language bespeaks nothing more than existing intention to donate art objects to the College if and when the spirit moves her in the future. (The repetitive reference to "jade" is puzzling. There was no jade collection. If Mrs. Dodge, who loved her art objects so much and had a ledger record of them, had been as acute mentally as some of the witnesses for the College suggest, it seems unlikely that she would not have corrected this misapprehension.) We emphasize the language because she had told McGraw that it "was exactly the kind of agreement she wanted." So as a consequence of the structure of the formal *219 deed of gift prepared by the railroad attorney, which they had discarded, Murray's clear recognition that his letter did not constitute "a legal document," and now McGraw's "confidential" report to Murray and Shoemaker, all three men knew the course of conduct she had in mind with respect to her art collection.
Apparently the dinner meeting of Mrs. Dodge and McGraw did not take place as scheduled on April 24. There is no testimony as to the reason for postponement. The next meeting about which he reported occurred on May 2. In the meantime the Murray letter which represented exactly what Mrs. Dodge had in mind for her art collection underwent the material alterations which precipitated this litigation.
On May 1 the executive committee of the College board of trustees had a meeting. Dr. Murray was present as was Charles A. Winding, chairman of the board of the Marine Midland Trust Co. of Southern New York a non-practicing member of the New York bar and an Elmira trustee. Winding had never met Mrs. Dodge or had any personal contact with her. At this meeting Dr. Murray produced a copy of the letter which had been given to Mrs. Dodge for signature on April 19. After looking it over, Winding revised it into a form which he considered would establish a present gift of her entire art collection. He did this, he testified, because he thought he was making it conform to her intention. On being asked how he knew what her intention was, he said he relied upon Dr. Murray's statements. If that is so, then Dr. Murray must have been considerably less than frank at the meeting. He had in his possession McGraw's report saying unequivocally that Mrs. Dodge had said the Murray form of letter was exactly the kind of agreement she wanted. In fairness and in equity he should have presented the McGraw report on the subject or at least have disclosed what it said. If he had done so, it is probable that, as a member of the bar, Winding would not have revised the letter and undertaken to change completely its legal character, without recommending that the two forms be presented to her for comparison *220 and the significance of the changes thoroughly explained to her, or that she take both of them to her lawyer for explanation. Silence under the circumstances may well signify a hope that the lonely old lady would sign the revision without appreciating that she was divesting herself of ownership of her art collection.
No time was lost in getting the revision to McGraw, who was to have dinner with Mrs. Dodge the next evening, May 2. Undoubtedly someone recalled she had taken home with her about two weeks earlier the original letter which she said would be signed and returned. If she remembered to do so and brought it with her on May 2, undoubtedly it would be difficult to convince her of the need to sign the revised one. Moreover, if she did bring it along, probably comparison between it and the new one would have to be made and explanations given for the changes. But if she forgot it, as might well be the case, and McGraw produced the revised one, she might not recognize it as any different from the one at home, or in any event, the problem of persuasion would be greatly eased. To meet the May 2 deadline, the revised letter was either dictated to McGraw's secretary over the telephone or it was delivered to him by special messenger; he could not recall which.
In the meantime, also, between the last meeting and May 2, Dr. Murray provided another token of the College's goodwill toward her. The photographs taken at Giralda in March (in most of which Mrs. Dodge appeared) had been enlarged and put in a maroon, tooled leather, loose leaf album with the name "Geraldine R. Dodge" imprinted in gold letters on the cover. Although the record is not entirely clear, apparently the album was sent to McGraw with a covering letter from Murray to Mrs. Dodge. Among other things it said:
"I recall that you said you never took a good picture and I think some of the pictures in the portfolio indicate that the camera caught the beauty that I saw, so this is one occasion when you did take a good picture."
*221 When McGraw and Mrs. Dodge met at Buscaglia's on May 2, the album was there. How it arrived is not clear. Anthony Buscaglia, the manager of the restaurant, who had known McGraw and Mrs. Dodge as patrons for about 16 years (although it was only in more recent years that they began to have dinner together), testified that McGraw had the album delivered there by messenger before Mrs. Dodge arrived. According to Buscaglia, he and Mrs. Dodge went over the pictures together. After finishing their examination and while waiting for McGraw to arrive, he testified, she said "These are the things, the treasures that aren't going to belong to me. They are going to belong to Elmira." When McGraw arrived, Buscaglia recalled, he (Buscaglia) was given the album to wrap up for Mrs. Dodge to take home with her.
In McGraw's May 3 report of that dinner episode to Dr. Murray and Shoemaker, he said nothing about having the album delivered so Mrs. Dodge could examine it before he arrived, or even that they did not arrive together. He testified that she was tremendously impressed with the photographs and "spent at least twenty to twenty-five minutes looking" at them. He then read "to her the letter of instructions" he "had prepared for her for the Commencement Weekend," which, he said, she was "very keen to make." (The week before commencement she wrote saying she would not attend.)
Obviously Mrs. Dodge had not brought along with her the original letter about her art collection which had been given to her the few weeks earlier. (It was found in her files three years later. McGraw testified he thought all copies of it had been destroyed.) His report does not say that she even mentioned it; clearly he did not inquire about it. (He admitted that about this time, "sometimes, perhaps" she was showing signs of "considerable forgetfulness.") He produced the new letter as revised by Winding, and read it to her twice (he said). There is nothing whatever to show that he pointed out to her the differences between it *222 and the earlier form, or what they meant in terms of bringing about a present completed gift, or that if she signed she would no longer own her art collection. Nor did he suggest that she discuss it with a lawyer or anyone else before signing. His sole comment on the subject was:
"I read this letter [and gave her a copy] to her twice and pointed out the advantages of doing it in this manner which includes tax deduction possibilities. She liked it and claimed that she would sign it and return it to me. However, before doing so she wanted to study it some more. I may be a very poor salesman but I was afraid to push her any harder. I am in hopes that I will get this next week when I see her for dinner on May 9th. If by any chance I fail, I am going to ask you two fellows to come to my rescue during the middle of this month. I want to have this agreement signed and in hand prior to Commencement." (Insertion ours.)
While testifying at the trial and on pretrial deposition, McGraw was asked what advantages he pointed out to her that would come from "doing it" in the manner outlined in this revision; also what "tax deduction possibilities" he mentioned. It is plain from his equivocations and ambiguous answers that he knew of no advantages that would flow to her if she signed, but simply said there would be advantages, in the same way he had been picking "figures out of the air" as to the cost of improving the Strathmont property. The fact is that, by comparison with the original letter, the revised one contained obvious disadvantages. He conceded he did not tell her that if she signed she would not own her art collection any more, and that there was nothing in the letter which required the College to keep the collection permanently, or which would prevent its sale immediately after her death. Considering his then relationship with her, and the obviously strong feeling of friendliness she had for him (they had grown "very close"), and his knowledge that her "right arm," Patterson, had been lost to her a few months earlier, his affirmative representation to her of advantages to be gained by executing the letter, and his silence as to the disadvantages, i.e., loss of ownership *223 of her collection, can only be described in equity as deception.
Comparison of the two letters reveals that the second was no hasty revision. Rather it was ingenious, well thought out and, as is now known, the product of a legal mind. The ingenuity rests in two factors: (1) the substantial retention of the original form and the effort to bring about, by changing and adding a few significant words, the transformation of an inchoate intention to make intermittent gifts in the future (which was "exactly" what Mrs. Dodge wanted) into a present completed gift with a privilege in the donor to retain possession of all or any part of her no-longer-owned art collection as long as she would be able to enjoy it; and (2) the preservation of such resemblance to the first form of letter as to render it less likely or even unlikely that an aged, uninformed woman, obviously losing her mental vigor, untrained in the law and confident of the true friendship and altruistic motives of McGraw, Shoemaker and Murray, would appreciate the legal significance of the changes. The new proposed form of letter follows, with the changes and additions underlined:
 "May , 1961
 Mr. Harold W. McGraw, Sr.
 Chairman of the Board of Trustees
 Elmira College
 Elmira, New York
Dear Mr. McGraw:
By this letter I wish to confirm the arrangements I have discussed with you concerning my entire collection of paintings, pictures, jade, bronze, and various objects d'art located in my home at Sixty-first Street and Fifth Avenue in New York City, at my New Jersey residence at Giralda Farms in Madison, New Jersey, and in storage in various places in New York City and elsewhere.
I wish to present and hereby do present and convey title to all of these items as a gift to Elmira College. It is to be understood, however, that I may retain possession of such items as long as I am able to enjoy them. I understand that the College has facilities available where these objects may be properly displayed and located, or will prepare such a display area for them. From time to time, I will relinquish possession of these items to the College as I desire.
*224 It is my hope that the College, its students, alumnae and friends will receive the same benefit and enjoyment from these objects as I have been privileged to receive."
Turning to the "tax deduction possibilities" McGraw said he suggested would flow from execution of the revised letter, it is obvious the statement was reckless; "pulled out of the air"; it had no basis in fact or in knowledge of her tax situation. It served his immediate purpose, and so it was made. The fact is that in 1960 the charitable contributions claimed by her exceeded the maximum deduction allowable under the income tax law. In 1961, without any sum being claimed for the alleged gift of the art collection, but including $130,000 cash given to Elmira College that year, the deductions claimed by her again exceeded the maximum allowable.
McGraw testified that at all times when he and Mrs. Dodge talked about making gifts of her collection to the College it was understood between them that she would retain possession and relinquish possession when she desired. He felt that such understanding was carried out in the revised form of gift letter. Yet in his report of May 3 he said that, after talking about the letter with its reservation of possession of the art collection, the "conversation * * * was directed to moving all of the art objects to Elmira. The first job will be to move everything that is now in storage. Then she is going to present to the College all of the objects that she has in her Fifth Avenue home including the cases, and last she will make a gift from the Madison house." This quoted excerpt gives rise to two inferences, both unfavorable to McGraw. First, in spite of the understanding that Mrs. Dodge would retain possession of her collection and relinquish it as she desired, as soon as he finished trying to persuade her to sign a letter which among other things expressly reserved possession to her, he "directed" the conversation to "moving all art objects to Elmira." Second, in spite of the revised language, he knew she did not intend to transfer title, or understand that she would transfer title immediately, to her art collection if she signed the letter. Otherwise, in referring to the *225 events to come after the signing, he would not have spoken in such terms as "going to present" and "will make a gift."
Finally, after concluding his report about his efforts to persuade Mrs. Dodge to sign the revised letter, he reverted to the development of the Strathmont property, and (he said) she inquired about the cost. Again he pulled "figures out of the air" and told her it would cost from $400,000 to $500,000, and she said she wanted to have a "very active part" in the work. Apparently she had forgotten that the matter had been discussed on April 18 and at that time, according to McGraw's report, she had in mind that "the half million dollars for all improvements at Strathmont will be a gift from her."
The next dinner date for May 9 was postponed by Mrs. Dodge for a week. In writing Dr. Murray and Shoemaker about it McGraw said: "If I have any trouble in getting the agreement signed, I am going to ask you two [Dr. and Mrs. Murray] to see her for lunch on Thursday." But on May 16 he did have dinner with her at Buscaglia's and she signed the revised letter. His report dated May 17 simply says he is "glad to give * * * the good news that she has signed the agreement whereby all of her collections of paintings, pictures, jade, art objects etc., are to be turned over to Elmira College." No explanation was given as to the circumstances of the signing or as to any discussion which preceded it; or as to when and where the date was typed in. He attached a photostat for Dr. Murray and Shoemaker; no signed copy was sent to Mrs. Dodge, then or ever.
In McGraw's testimony about the May 16 meeting, he said on direct examination that Mrs. Dodge brought with her the revised letter she signed that night. He had given it to her two weeks earlier so she could study it at home. But he had given her only one copy on that earlier date, and on cross-examination he was shown an unsigned carbon copy of a letter found in her file which contained the same matter, but had been written on a different typewriter and with the date "May ____ 1961" typed in a different place from *226 the signed letter. He could not account for the differences between the two, nor for the existence of the letter with the differences in form in her file. It was at this point that counsel obtained the cautious admission that at about this time Mrs. Dodge was "sometimes, perhaps," showing signs of considerable forgetfulness. Then it was suggested to him that the letter which was signed that night was another copy made by him and taken with him to Buscaglia's Restaurant in order to be prepared for the possibility that she would forget to bring along the one he had given her earlier, and when it appeared she had forgotten it, he took the new one out of his pocket for her signature. He did not deny this, but said he could not remember.
As has been indicated earlier, the College produced Anthony Buscaglia, then manager of the restaurant, to corroborate some aspects of McGraw's testimony. Our study of his statements leaves us with serious doubts as to his general credibility. He was obviously eager to help the cause of the College and reacted quickly to leading questions pointing in that direction. His testimony was directed principally to two subjects: the album containing the photographs of the art works at Giralda, and the signing of the May 16, 1961 letter by Mrs. Dodge. At one place in his direct examination he began to indicate that the album incident and the letter-signing took place on the same evening. Then a leading question and affirmative answer separated the two events, putting the album examination first and the letter execution second. But on cross-examination he was unable to recall whether both took place on the same evening. There can be no doubt that different evenings were involved; and the position of the College is that it was merely a fortuitous coincidence that on both of these occasions, which are so pertinent to the present case, Mrs. Dodge arrived at Buscaglia's alone, in sufficient time before McGraw appeared to permit conversations between her and Buscaglia about her art collection and her donative intent toward Elmira College. In the final analysis of Buscaglia's testimony, *227 however, two facts emerge: (1) in all probability McGraw brought with him the letter that was signed on May 16 and (2) Mrs. Dodge told Buscaglia before McGraw arrived that she "was going to sign a letter to Mr. McGraw stating that these art works will be eventually donated to Elmira College."
When Mrs. Dodge signed the letter of May 16, 1961, the relations between her and the College with respect to ownership of the entire art collection became fixed. The College claims that a completed gift, within the legal test set forth above, had been made, and full title vested in it, subject only to her right to retain possession for life if she chose to do so. Where an inter vivos gift is alleged to have been made by a person who thereafter is adjudged incompetent, and the claim is contested by the incompetent's guardian, the claimant must establish his case by clear and convincing proof. Aside from a rather recent statute, L. 1960, c. 52 § 45, N.J.S. 2A:81-2, which partly codified the rule, the common law has always imposed a heavy burden of proof in most instances of claimed inter vivos gifts, even where the donor is not shown to have been mentally incompetent at the time of the transaction. The principle has been expressed frequently that "in all transactions between persons occupying relations, whether legal, natural, or conventional in their origin, in which confidence is naturally inspired, is presumed, or, in fact, reasonably exists, the burden of proof is thrown upon the person in whom the confidence is reposed and who has acquired an advantage, to show affirmatively not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood." In re Fulper's Estate 99 N.J. Eq. 293, 302 (Prerog. Ct. 1926).
In the application of this rule it is not necessary that the donee occupy such a dominant position toward the donor as to create an inference that the donor was unable to assert his will in opposition to that of the donee. As Chief Justice Gummere observed in Slack v. Rees, 66 N.J. Eq. *228 447, 449 (E. & A. 1904), the doctrine has a much broader sweep. "Its purpose is not so much to afford protection to the donor against the consequences of undue influence exercised over him by the donee, as it is to afford him protection against the consequences of voluntary action on his part, induced by the existence of the relationship between them, the effect of which upon his own interests he may only partially understand or appreciate." In our judgment, whenever it appears that the relations between the parties to an inter vivos gift are of such character that in reasonable probability they do not deal with each other on terms of equality because one has given friendship and justifiably reposes confidence in the other, that on the donee's side superior knowledge exists as to the nature of the transaction proposed by him, as well as the detriment to be suffered by the donor if he engages in it, and the donee fails to see to it that the donor thoroughly understands its nature and consequences, equity should regard it as voidable at the instance of the donor or his representatives. In such a situation the donee must show by explicit and convincing evidence that the donor intended to make a present gift and unmistakably intended to relinquish permanently the ownership of the subject of the gift. Schilling v. Waller, 243 Md. 271, 220 A.2d 580 (1966). Only that understanding and absolute abnegation of power will make the alleged gift enforceable. Cook v. Lum, 55 N.J.L. 373, 376 (Sup. Ct. 1893); Hall v. Otterson, 52 N.J. Eq. 522, 530, 532 (Ch. 1894), aff'd sub nom. Otterson v. Hall, 53 N.J. Eq. 695 (E. & A. 1895). If the judicial mind is left in doubt or uncertainty as to exactly what the status of the transaction was, the donee must be deemed to have failed in the discharge of his burden and the claim of gift must be rejected. De Mouy v. Jepson, 255 Ala. 337, 51 So.2d 506 (1951). And where death or incompetency of the donor has intervened between the alleged gift and the making of the claim, which generally facilitates the making of false and non-meritorious claims, the common law has long recognized a particular need for compliance with the burden of *229 proof; and the Legislature by its statute, 2A:81-2, has made the need a matter of public policy. In this way, although all such claims may not be avoided, such requirement will, at least, reduce the number. Schilling v. Waller, supra, 220 A.2d, at 583.
The basic principle which underlies and makes all of those referred to above especially pertinent here was expressed many years ago in Mott v. Mott, 49 N.J. Eq. 192, 198 (Ch. 1891), wherein Vice Chancellor Green quoted with approval from well known English cases:
"`It is that great rule of the court that he who bargains in a matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence,  a rule applying to trustees, attorneys, or anyone else.' Lord Elden in Gibson v. Jeyes, 6 Ves. 266, 278. `The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful condition by defining the exact limits of its exercise.' Lord Chelmsford, in Tate v. Williamson, L.R. 2 Ch. App. 55, 61. "The jurisdiction is founded on the principle of correcting abuses of confidence, and I shall have no hesitation in saying it ought to be applied, whatsoever may be the nature of the confidence reposed, or the relations of the parties between whom it had subsisted. I take the principle to be one of universal application, and the cases in which the jurisdiction has been exercised those of trustee and cestui que trust, guardian and ward, attorney and client, surgeon and patient to be merely incidents of the application of the principle.' Vice Chancellor Turner, in Billage v. Southee, 9 Hare 539, 540."
See, also, In re Fulper's Estate, supra, 99 N.J. Eq., at 314.
The evidence presented at the trial shows beyond question that a feeling of warm friendship, affection, respect, trust and confidence for McGraw, Shoemaker and Dr. Murray had developed in Mrs. Dodge. They promoted and cultivated it, not for its intrinsic value but in order to serve ulterior material purposes of their own. She was lonely and had few friends; she was aged and unquestionably deteriorating in mental vigor; she was without her long time advisor during the critical period, as they knew; she had an unusual family life and apparently little affection or companionship *230 from relatives. As events proved, she was an open door to the superficial manifestations of friendship and blandishments of able men. She was alone against the persuasion of three such men who were determined to obtain financial aid for the College from her. The odds were not fair and they became even more unequal when a member of the bar came to their aid in preparing the crucial gift letter which was at odds with the earlier instrument that was "exactly" the kind of agreement she wanted. The similarity between the two letters, and the likelihood that she, as a lay person, would not appreciate the legal significance of the differences, McGraw's failure to explain the differences or to advise her to seek competent advice about them, and his active deception as to alleged advantages to her from the revised letter, require the conclusion that proof adduced by the College was inadequate to meet the burden of establishing clearly and convincingly that Mrs. Dodge either intended to make or understandingly made a present completed gift of her $1,700,000 art collection. The sins of the able are no less sins when committed in what they believe to be a worthy cause.
The most that can be said with any reasonable probability about the probative value of the proof at the time the May 16, 1961 letter was signed is that it demonstrates a general donative intent on Mrs. Dodge's part toward Elmira College. In its most favorable cast it shows a probable intention to make periodic gifts of portions of her art collection, as and when the spirit moved her in the future. But it falls far short of establishing in a clear and convincing manner that she ever intended, either before or when she signed the May 16 letter, to make an immediately effective, absolute transfer of ownership of the entire collection to the College, or that she understood such was the effect of placing her signature on the letter. On the contrary, one fact stands out like a beacon: she never at any time intended to relinquish dominion and control over the collection; she always felt that hers was the decisive hand in the matter of the disposition of her art objects, and that she had not lost that power on May 16.
*231 Our view in those respects is fortified by the events and attitudes of the parties subsequent to that date. In that area the testimony is persuasive that McGraw and Dr. Murray realized Mrs. Dodge was not aware she had transferred ownership of her collection to the College, and deliberately refrained from doing or saying anything to her, or to those who might inform her, to indicate or to call attention to such a claim.
After the May 16 letter, the correspondence indicates that the McGraw-Mrs. Dodge dinners continued and the pressure mounted to persuade her not only to send parts of her collection to Elmira, but also to make cash contributions in increasing size. In June, McGraw talked to her about a donation toward the furnishing of Dr. Murray's new home. She agreed to give $30,000. Around that time Mrs. Dodge wrote Dr. Murray, saying she hoped by late Fall it would be possible for her to look over her house in New York "where a great many of my bronzes are kept, and select those that will be sent to Elmira." But following a dinner meeting with McGraw on July 14, he reported that, after spending two hours discussing the movement of art objects to Elmira, she had agreed to move everything then in storage and in her Fifth Avenue home to the College beginning about August 1. On this occasion he did not receive from her the $30,000 check she had promised, but he hoped to get it the next time. But the following week, July 26, 1961, in the "personal and confidential" report to Dr. Murray and Shoemaker, he said "she forgot completely to bring the check for $30,000 last night as she promised." He was sorry to observe "she is getting very forgetful. * * * In a kind way [he] had to spank her a little bit and she has now promised to bring the check" next week. He then reported that "she now has definitely in mind the idea of starting to move the art objects * * * [to Elmira] on or about September 1." And he suggested that the three of them (Murray, Shoemaker and McGraw) get together "soon," because he wanted "to see us go after *232 her for a minimum of a million dollars." This ambitious resolve was stimulated by information received from Harold Helm of the Chemical Bank New York Trust Company, who said Mrs. Dodge "is worth somewhere in the neighborhood of three hundred million." Finally, McGraw exposed the reason for the meeting with his two colleagues: "I am fearful that if we do not get a commitment this year we may lose it."
As has been said earlier, Mrs. Dodge, her companion Miss Ellis, and the Murrays had lunch in New York in July. It is relevant to note here that between May 16 and this date, Mrs. Dodge had not told Miss Ellis about signing the so-called gift letter or anything to indicate that the collection had been given to the College. During lunch she said she would ship some of her bronzes from the Fifth Avenue residence after the summer vacation. It is obvious from Miss Ellis' testimony that Dr. Murray said nothing to her or to Mrs. Dodge at that time about the May 16 letter or about the alleged completed gift of the entire collection. Miss Ellis did say that in a side conversation she told Dr. Murray they were pushing Mrs. Dodge "too hard," and that they would "get more if they stopped pushing her."
On August 9, McGraw telephoned Mrs. Dodge and arranged for Dr. and Mrs. Murray to have lunch with her at Giralda on August 11. By letter he advised the Murrays that it would be a "sociable call" and they would not have to do any "selling." On August 15 McGraw again had dinner with her at which time, he reported, she "broke down and wanted to talk very confidentially." She said she regarded the Murrays and Shoemaker as three of her very close friends, that she was getting very old and thought her life span was very limited. She indicated (according to McGraw) that "late this fall" she wanted to make a "very substantial gift to the College," which he would guess "will be cash of at least a million dollars." He concluded:
*233 "In summing up, we have all spent a great deal of time cultivating this lady and I am glad to say that it is beginning to pay off. I believe that we have a few months in which to work together for a very substantial gift as referred to above."
The weekly dinners continued. August 22 was "purely a social visit. For the first time in many weeks [he] did not ask her for anything." The next dinner was planned for September 5, at which time McGraw reported he would "be back on [his] job endeavoring to move the art objects, paintings etc. from New York to Elmira. Later [he would] start planting more seeds in her mind about the million dollars that the College needs for expansion and endowment."
No art objects were shipped to the College in September nor were any cash contributions made. McGraw reported after dinner with Mrs. Dodge on October 3 that now she was thinking of having appraisals made on the art objects and starting shipment soon. He said she planned to come to Elmira on October 21, but he "seriously" doubted that she would make the trip. (She did not come.) Then he passed on some important information. She had appointed a new general manager, "an old employee and from what she tells me, not particularly well suited to the job, but at least he is better than having no one." And he told Dr. Murray and Shoemaker that Mrs. Dodge had given him permission to announce "her gift of art objects, paintings, etc." on October 21. On October 16 McGraw wrote Mrs. Dodge that Dr. Murray and a Leonard Doran would call at her Fifth Avenue residence on October 18 at which time "perhaps they can work out for you a program in order to have certain art objects appraised and shipped to the college."
No gift announcement was made on October 21. Some time during that month Mrs. Dodge, Sayres (the new general manager) and Dr. and Mrs. Murray had lunch together. There was some discussion about shipment of art objects, but no mention to Sayres of the May 16, 1961 letter. Thereafter, on October 31, Sayres, after talking with Dr. Murray by telephone and then with Mrs. Dodge, wrote Dr. Murray *234 saying that "several points have entered this matter which at the moment are a bit puzzling." He said also that "the extent to which art objects [are] to be sent to Elmira from Mrs. Dodge's collection has not been determined according to any commitments of record at Giralda." And he suggested for purposes of a "better and more thorough understanding" of the matter that a "detailed resume be sent for her consideration so that an appropriate acknowledgment can be determined." A copy of the letter was sent to McGraw, who was to have dinner with her that week. After seeing her and talking with Murray, McGraw on November 6 wrote Sayres, saying among other things:
"Second, you mentioned the extent to which art objects are to be sent to Elmira from Mrs. Dodge's collection. As far as I know, there is no commitment as to when any piece of art or any paintings are to be sent to the college. It has always been my impression that items are to be sent to the College when Mrs. Dodge desires to release them."
In his testimony Dr. Murray said the ideas set out in McGraw's letter had been agreed upon. Obviously they deliberately refrained from disclosing the alleged May 16, 1961 gift letter to Sayres. Their answer to him was as ingeniously deceptive as their concealment is now revealing, with respect to the confidence they had in the legal merit of the gift letter. Moreover, Murray wrote to Sayres also, on the same day as McGraw, saying that after receiving his note "a review was made of all the conversations and letters with Mrs. Dodge" and that McGraw was writing to Mrs. Dodge, with a copy to him, which he hoped would satisfactorily answer the questions that have arisen. Apparently the McGraw letter was sent to Sayres with a copy to Mrs. Dodge; the copy was found in her file. So far as Mrs. Dodge is concerned it contained nothing which would indicate to her that Elmira College owned her art collection as of May 16, 1961. Murray's explanation for the "carefully worded" letter was that they did not trust Sayres. But up to this *235 time the Murrays had met him only once for lunch with Mrs. Dodge; McGraw had not met him at all. And why, if a copy was going to Mrs. Dodge, did they agree not to say anything which would call her attention to their claim of completed gift? Furthermore, seven weeks later McGraw wrote to Murray and Shoemaker that Sayres "seemed to be a decent sort of a chap, and as of this moment I am not worried about his putting any road blocks in our way." The following week, in reporting that the Murrays, Mrs. Dodge, Sayres and himself were to have lunch on January 4, 1962, at which time he was to meet Sayres, he said: "I am inclined to believe that we have nothing to fear from this new general manager. I feel that he will play ball with us."
Returning to the chronology of events, the record shows that on November 8, 1961 McGraw wrote Dr. Murray informing him that Mrs. Dodge had cancelled two engagements, that "apparently she is not well and also it seems to me that she is scared to death of crowds." Nevertheless, he had dinner with her at Buscaglia's on November 21. He then reported to his colleagues that she had been under the impression that Murray intended to leave on his sabbatical trip early in December and she felt she would not be able to send "her next gift" of art objects until he returned. His comment on this is informative: "Where she got this idea I do not know." But he said the matter had been ironed out and "the art objects to be sent" have been appraised.
Late in the afternoon of January 4, 1962, the day McGraw first met Sayres, Dr. and Mrs. Murray and McGraw called at the Dodge Fifth Avenue home where arrangements were made for shipping the bronzes kept there to Elmira. McGraw felt Sayres acted officiously and so reported later to Shoemaker and Dr. Murray. He noted also that Sayres had an idea about building a museum in Madison for all of the art objects. But McGraw did not tell Sayres then, nor had he told him at lunch earlier, that Elmira owned the art *236 collection by reason of the May 16, 1961 letter. After Mrs. Dodge had selected the bronzes for shipment, she changed her mind about a few of them and sent them to Madison instead. In any event, toward the end of January, 23 bronzes valued at $77,000 were delivered to the College. It is most significant to note that a short time after this was done, in conversation about any further shipment of art objects to Elmira, Mrs. Dodge said to Miss Ellis, "That ends that." The air of finality the expression portrays was meaningful: No more art objects were ever sent to Elmira.
McGraw carried on the dinner meetings through January. Early in February after one such meeting he advised Shoemaker and Dr. Murray that Mrs. Dodge seemed in an excellent frame of mind, and that he had informed her the College needed $1,300,000 for planned development, in addition to the assistance of $1,400,000 expected from the Federal Government. And he felt confident she would give a minimum of $250,000 "for this project * * * and considerably more if we are smart." Apparently Sayres was not accompanying her to these meetings, as Patterson did in his lifetime. On February 27, McGraw had dinner with her, and the next day wrote his customary "personal and confidential" memorandum in which he said, among other things, "she is certainly confused and apparently the one who talks to her last holds the inside track." Nevertheless, he went over with her "all of the ground that we have covered a great many times previously regarding the needs of the College," and he was confident that the following week he would get a pledge of $250,000. At this meeting she talked of erecting a building in Madison to house "many of her art objects, paintings etc." She said she was very much interested in this idea (which he felt represented Sayres influence). But it is plain that he did not remind her of the alleged gift letter or tell her she no longer owned the art collection. Instead, his memorandum reveals an attitude of recognition of her right to so house her collection, and his resignation to it. He comforted his colleagues by pointing *237 out that her reputed wealth is about 300 million, and even though the Madison project may take a few million, "there is enough available in her estate so that we can still get a large share."
On June 11, 1962, Mrs. Dodge wrote McGraw apologizing for the delay in answering his letter of February 7 in which he had outlined the cost figures he had given her the previous evening. She told him of her many other commitments and said she would contribute $25,000 toward the work on the new buildings. Dr. and Mrs. Murray went to Europe that summer. They did not see her again. After receiving the $25,000 check, Dr. Murray had some further correspondence with her, in none of which was her art collection ever mentioned. He mentioned "circumstances of her health" and his busy program at Elmira as reasons for not visiting New York City. But McGraw's activities did not cease. He had dinner with her on October 10 and was "sorry to tell [Dr. Murray and Shoemaker] that time is running out when we can get help from her for Elmira College." He reported, however, that he was confident he would get another check for $50,000 before the end of the year, which was only "a drop in the bucket in comparison to what we would like to have. We want at least $500,000 in cash next year or its equivalent in pledges to be honored at a later date. We would also like to have a bequest in her will for at least five million dollars." Then he continued:
"To get the above gifts, to say nothing of more art objects, paintings, etc., I need help. I realize how busy you both are but I feel that this is vitally important because of the College. I have seen her practically every week for months and years. At this time I feel that a new approach is desirable and will prove beneficial. I am asking you two fellows to see her either in Madison or New York and discuss with her the subject of gifts as mentioned above. After you have laid the groundwork I will then follow through but I will appreciate your digging into this situation at an early date. As I said at the outset, our time is running short." *238 There is nothing in the record to indicate that Shoemaker or Dr. Murray responded to McGraw's anguished cry for help.
One fact of great probative force conclusively appears from the testimony and the many letters introduced: Mrs. Dodge never told anyone close to her  Miss Ellis, her constant companion, Miss Rini, who for many years catalogued her art collection and noted changes in it, or the accountant who did her tax work  about the alleged gift of her entire art collection to the College. In this connection a significant circumstance took place on January 25, 1963. Clyde A. Zukswert, an accountant, wrote to Dr. Murray advising that he took care of her accounting and federal income tax matters. In order to complete her income tax return for 1962, he asked for information as to the amount of donation received by the College from her during that year. Murray sent a copy of the letter to McGraw, saying "we might spend some time discussing the ramifications [of this] when we are together next time." He did this, he testified, because it was obvious "somebody didn't know" about the 1961 gift to the College of the art collection. They did discuss the matter, and thereafter Murray wrote to Zukswert advising him of the gift of 23 bronzes valued at $77,000 on January 22, 1962 and of the $25,000 cash gift in June 1962. The alleged 1961 entire art collection gift was not revealed; Zukswert was not told that the bronzes, although delivered in 1962, were actually a part of a completed gift of the entire art collection made in 1961 and should be treated as a deductible item for that year. Nor was he informed of the tax "advantages" McGraw allegedly advised Mrs. Dodge would result if she signed the gift letter. The deliberate concealment from the accountant and from Sayres is a portentous factor in evaluating the credibility of the College's present claim. Fair disclosure would have brought the matter into the open at a time when Mrs. Dodge probably had sufficient mental capacity to admit or refute the alleged gift. The inescapable inference is that McGraw and *239 Dr. Murray realized Mrs. Dodge never intended to transfer complete ownership of her collection on May 16, 1961, that she never was made to understand that such would be the effect of the letter, and that she never did understand the nature of her act in signing it. The College did not assert a claim of ownership of the art collection until June 8, 1964, more than three years after the alleged gift. In the meantime, on June 18, 1963 (almost a year before the claim was made), Mrs. Dodge was declared mentally incompetent and her testimony was gone forever. Shortly after her husband's appointment as guardian, he sought instructions from the court with respect to obtaining insurance on her real and personal property. It had been Mrs. Dodge's practice not to carry insurance, even on her valuable art collection. This was because her estate and income were so large that the tax advantages of a loss were considered as rendering the premium expense unnecessary. On July 5, 1963 the court ordered the acquisition of insurance to cover "all buildings, furniture, furnishings, art works and other personal effects." In the factual picture of the case, Mrs. Dodge's failure to obtain insurance after May 16, 1961 has significance. If she understood she had donated her entire art collection to Elmira on that date and simply had the privilege of possessing it until she ceased enjoying it, she might very well have obtained insurance to protect the ownership of the College, or offered to permit the College to do so. The situation adds still another inference to the sum of the evidence reflecting adversely on the claim of gift.
About five months after the insurance incident, her guardian-husband returned to the Chancery Division for instructions as to whether he should continue his ward's practice of making charitable contributions. His petition recited the contributions she made for the years 1959 through 1962. The court authorized the making of contributions to those charitable organizations which had benefited during the stated years, the amount to be given to each one to be the average annual amount given to it by Mrs. Dodge. *240 The total of the contributions was limited by the order to the sum which would represent the maximum allowable charitable deduction for the year 1963 under the Federal Internal Revenue Code. As the result, a check for $93,850 was sent to Elmira College on December 9, 1963 with the comment that, pursuant to the court order, it represented the average of Mrs. Dodge's contributions to it during the four years prior to 1963. Dr. Murray acknowledged the check four days later but once again made no reference to an alleged gift of the $1,700,000 art collection on May 16, 1961.
The events and circumstances subsequent to May 16, 1961, as outlined above, add to our conviction that Mrs. Dodge not only did not have the intention to transfer ownership of her art collection when she signed the alleged gift letter, but also did not understand that she was giving up her title upon affixing her signature to it. Her age, loneliness, insidiously progressive arteriosclerotic disease, and loss of her trusted advisor made her respond with friendship and confidence to the synthetically effusive attention and appearance of friendship pressed upon her by the representatives of the College, particularly by McGraw and Dr. Murray. What they failed to accept is that her response to their pretense imposed an equitable obligation to deal fairly and openly with her. McGraw's pressure and manipulation of her to achieve their ends, even after the alleged gift was made and when patently he knew she was waning mentally, leave his credibility seriously doubtful. His failure to explain the differences between the April and May letters and their drastic legal connotation, after the former had been deceptively revised into the latter by an attorney acting in the interest of the College, further impugns the value of his testimony. His reckless and misleading statements to her about advantages, including possible tax advantages, she would achieve by signing the proffered letter demonstrate that he and Dr. Murray considered that the end justified the means employed, however inequitable their nature. And *241 the post-May 16, 1961 efforts to avoid disclosing the letter and their claim of its legal effect confirm the unavoidable conclusion that they knew of the weakness of their position.
We are aware that the trial court made a factual determination in favor of the College, and we are conscious of the usual reluctance of an appellate tribunal to interfere with such a finding. In this type of case, however, the finding must be examined in light of the burden of proof which the College had to meet, i.e., to establish by clear and convincing evidence that Mrs. Dodge intentionally and understandingly made a present gift of her art collection to it on May 16, 1961. The proof offered to meet that test was unusual. This is not a case where each party to the controversy produces various witnesses who tell conflicting versions of a transaction. Most of the evidence here was in the form of letters and "private and confidential" memorandums which passed among the principal actors on the College's side of the case, both before and after the alleged gift. Those documents speak more loudly than the self-serving testimony on the witness stand. And the testimony must be scrutinized and evaluated carefully against the background of the documents, as well as the out-of-court conduct of the witnesses before the controversy arose. Viewed with these factors in mind, we find that in their totality the proofs are utterly inadequate to show clearly and convincingly that an enforceable completed gift was made on May 16, 1961. Consequently a contrary conclusion cannot be sustained.

II
In addition to alleging a completed gift in May 1961, the plaintiff raised an alternative issue. It claimed that if such a gift was not made, Mrs. Dodge had made statements on numerous occasions that she was going to give her art collection to the College. On the basis of such statements and the May 16, 1961 letter, an alleged course of conduct was embarked upon by way of preparation to house the *242 collection which justifies application of the doctrine of promissory estoppel, and requires enforcement of the gift.
The trial court did not deem it necessary to decide the question in view of its conclusion on the principal claim. In view of our evaluation of the evidence detailed above, we see no need to outline or to discuss the additional circumstances said to support an estoppel. It is sufficient to say there is no adequate basis for such a finding.

III
The judgment is reversed and the matter is remanded for entry of judgment for the defendants.
HALL, J. (concurring).
While I agree with the court's conclusion that no effective gift of her entire art collection was made by Mrs. Dodge, I would reach that result by a substantially different path.
The College's claim has to rest on the informal letter of May 16, 1961. If that document is legally insufficient to accomplish the asserted object, the claim must fall. The alleged nature of the gift was a then transfer of ownership of all her art objects, subject to the right to retain possession thereof, if she so desired, "as long as I am able to enjoy them." The claimed gift was at best, therefore, that of the remainder interest. The theory of this suit, accepted by the trial court in its judgment, is that the adjudication of Mrs. Dodge's incompetency established the permanent lack of ability to enjoy the art objects except those on display in the mansion house at Madison where her condition confined her. The possessory interest in the objects elsewhere was thereby terminated, with that in those displayed in the Madison home to continue until her death.
The opinion of the trial judge, 90 N.J. Super. 198 (Chan. Div. 1966), decided that a valid and effective gift can be made of a remainder interest in personal property. This court's opinion assumes the same proposition and I concur. Concededly, however, two of the generally recognized requisites *243 of an inter vivos gift of personal property, at least where the whole bundle of rights therein is purported to be transferred, are missing here, i.e., actual or symbolic delivery of the subject matter and absolute relinquishment of ownership and dominion, at least to the extent practicable or possible considering the nature of the thing given. The trial judge held that these requisites are not appropriate in the instant situation because the gift was of the remainder interest, subject, at the outside, to a retained life estate. The trial judge also concluded that an enforceable gift of a remainder interest, with a retained estate in the donor, can be accomplished by a writing not under seal despite the absence of any delivery and the retention of some rights of dominion over the subject matter. While this court's opinion indicates it is not passing on these questions, its underlying thesis assumes that the letter on its face and in and of itself was sufficient to constitute an effective gift of the remainder interest, but not enforceable for another reason.
Without entering into a lengthy discussion, my view is that a gift of a remainder interest in personal property ought to be held effective in this day and age without formal, ritualistic requisites. I would think it enough that there be an informal, unsealed writing, without, in view of the nature of the gift, any delivery or other manifestation of relinquishment of dominion and control. Cf. Foster v. Reiss, 18 N.J. 41, 56 (1955) (dissenting opinion). I do not feel that anything of value is added in this state today by a typed or printed "L.S." after the signature or even by impressing a gold wafer and affixing a red ribbon. But such a writing must be so unequivocally plain and clear on its face and standing alone that there cannot be the slightest doubt of the donor's intent to make a present, irrevocable gift and the detailed terms and conditions thereof. If such is not readily apparent, it seems to me that ought to be the end of any claim of valid gift, all the possible supplementary oral evidence notwithstanding. This suggested thesis would seem to be the real rationale of the decisions elsewhere holding that an outright *244 inter vivos gift may be made by the donor's instrument under seal, without any delivery of the thing given. It also meets the most fundamental requirement applicable to all gifts that they must be established by clear, cogent and persuasive evidence. Farris v. Farris Engineering Corp., 7 N.J. 487, 501 (1951). Such a requirement applies whether the donor is living and competent or dead or incompetent at the time of the contest. Incidentally, I doubt that anything is added by the "clear and convincing proof" requirement of N.J.S. 2A:81-2 where the claim is asserted against a donor who has since died or become a lunatic. Of course, even if an informal writing is as unequivocal and complete as I urge it must be, an attack upon it would still be open on the basis of incompetency when made, undue influence, lack of understanding of the document or its effect, fraud or other equitable reason.
It is certainly unquestionable to me that the letter of May 16, 1961 is not the unequivocally plain and clear document that I would require. Prepared by the donee, even in the form in which it was rather offhandedly revised by a non-practicing lawyer, it is confusing, if not internally inconsistent, and could well be understood by a layman to mean nothing more than an expression of intent only to give art objects to the College to the extent and when the signer might decide during lifetime. The formal and unfamiliar language of conveyance of title could reasonably be overshadowed by the provision for retention of possession "as long as I am able to enjoy them"  putting aside the difficult matter of what that phrase means and how it could possibly be objectively determined  and by the provision for relinquishment of possession "as I desire." As a matter of fact, Mrs. Dodge's subsequent conduct clearly demonstrates that she did not conceive of the writing as anything more and there is no doubt that the College's conception of its intended effect was not expressly or adequately called to her attention at any time.
I would consequently disagree with the finding of the trial court that the letter is "a clear statement by Mrs. *245 Dodge of her donative intent." 90 N.J. Super., at 209. On its face I think it certainly is not and the oral testimony the court referred to did not make it so. Even more fundamentally, it does not, as a matter of law, meet the previously sketched criteria I would insist upon as a sine qua non. Thus to me the case is ended and I would decide it for the defendants on this basis without more.
This court's opinion chooses, rather, to reach this result on an approach which I believe is not fully warranted. My evaluation of all the evidence leads me to the view that a rationale of a long term, unprincipled scheme, participated in by the President of the College and trustees Shoemaker and McGraw, to deceive Mrs. Dodge into making gifts, culminating in the May 16, 1961 letter and the claim based thereon, is not a justifiable one and that many of the characterizations expressed in its development are too condemnatory and unfortunate. I cannot agree with the portrait of an aged, helpless, deteriorating lady who was unable to resist, doing what she did for Elmira not because she genuinely wished to but only by reason of improper pressures and impositions.
I am convinced that Mrs. Dodge was an intelligent, able, strong-minded woman, exceptionally so for her age. The evidence to me is clear enough that mental deterioration did not set in until the second half of 1962 and I think it is idle to intimate that she was approaching incompetency in the winter of 1961. In this connection it may be noted that she made three substantial donations to Elmira after the letter of May 16, 1961, which are not questioned by the guardians. A couple of months thereafter she gave $30,000, matching a gift of Mr. McGraw, toward refurnishing the President's home. In January 1962, she selected and shipped to the College from her collection of bronzes, items appraised at $77,000, and in June of that year she sent her check for $25,000 with a letter stating that the money could be used for whichever of several buildings then under construction the President liked best.
*246 Mrs. Dodge had always taken an active part in the management of her capital, annual income of over a million dollars and physical properties, even more so after the death of her manager, Mr. Patterson, in February 1960, and was certainly knowledgeable in worldly and business matters. She was long used to caring for her own affairs completely independent of her husband. While undoubtedly sheltered and perhaps lonesome, in the sense that persons who are publicly known to have great means and large physical establishments necessarily become, she was no mental recluse. I am convinced she was never, even at the age of 79 or 80, "taken in" by anyone and in the final analysis made her own decisions as her personal interests and wishes dictated.
She was also laudably conscious of an obligation to contribute heavily to worthwhile civic, educational and other enterprises according to her interests as she determined them. Beyond a lifetime interest in the acquisition of art and the dog world, she had been a large donor over the years to local charities and improvements and certain educational institutions long before Elmira came into the picture. The extent of her contributions is illustrated by the figures in the record which show that in each of the years from 1959 through 1962 she gave to charity between approximately $150,000 and $300,000, the figure in two of those years exceeding the permissible deduction for federal income tax purposes. She was certainly accustomed to solicitations, and, I am sure, to continual cultivation, or attempts at it, by many seekers of funds for worthy causes. Requests were made at the rate of 40 to 50 a week and the problem was to select those she thought were worthwhile. She obviously was a discriminating giver and one can be sure she readily recognized cultivation. She was certainly no "easy mark" and it was natural that prospective donees would seek to approach her through friends, for she obviously could not open her door to every stranger.
I am positive that when she was approached in the late fifties on behalf of Elmira by Messrs. McGraw and Shoemaker, *247 whom she had known for some time, she fully appreciated they were after "big money" and would strongly seek to elicit her favorable interest over a considerable period of time. The testimony of Mr. Shoemaker, which rings very true to me, supports this view completely:
"A. I told Mrs. Dodge very frankly very early in starting about Elmira College that I said, `Mrs. Dodge, we have had a very pleasant relationship with respect to Overlook Hospital.'
I said, `I don't want any misunderstandings between us at all, because I think a great deal of you and I am interested in Elmira College. I am on the board of trustees of Elmira College and I am going to do everything I can to whet your interest in Elmira College.'
And she smiled and she said, `When it is a worthwhile enterprise that is exactly what I would expect you to do.'
Q. Did she give you any indication that she might be in a position to make a contribution to Elmira? A. Well, she gave me every encouragement to believe that she could be persuaded to make a gift or gifts to Elmira if she were convinced that it was a worthwhile cause.
Q. Did she indicate to you that she had any family responsibilities that might impede making a contribution?
A. To the contrary, Mrs. Dodge spoke about that upon at least three occasions to me and said that, `You know, Mr. Shoemaker, I have no children to leave my money to, only some distant relatives. I would like to think that some of my worldly goods at least are going to be used for something worthwhile rather than be sent to Washington.'"
There can be no doubt that Messrs. Shoemaker, McGraw and President Murray made continuous efforts to solicit and increase Mrs. Dodge's interest over a period of several years. They were certainly men sincerely devoted to the welfare and improvement of their institution. Mr. McGraw, a wealthy man himself, had personally contributed half a million dollars. I cannot conceive that they pursued Mrs. Dodge with any design to deceive or misrepresent. While one might not like their method, it cannot be branded as illegal or nefarious or the individuals as fraudulent schemers. Mrs. Dodge did not rebuff them, as I am sure she was fully capable of and experienced in doing. Rather she developed what I am certain, from evidence beyond the statements in many of Mr. McGraw's seemingly overenthusiastic *248 reports, was a genuine interest in the College. What spawns or motivates interests in people of her status can never be decided with complete assurance. It may be vanity derived from an honorary degree or a building named for the person, rivalry with some other benefactor, inward appreciation of attention paid, or a dozen other things. But to me, that is immaterial and I see nothing wrong.
The evidence is further unquestionable that Mrs. Dodge herself first broached the matter of gifts of her art objects. Her general interest in the College rather early became particularized, quite naturally in view of her extensive collection, in the art program and curriculum at Elmira. I am satisfied, again from evidence other than the words of the College people, that as early as 1958, she talked about giving some of her collection, which led to consideration of a suitable building and resulted in the delivery of $48,000 worth of porcelains in May 1960 and a pledge of $250,000 a month or so later (with a payment thereon of $100,000 in September 1960, and a like amount in January 1961) "to erect a building to house all art objects that I have given and may give in the future."
I am fully convinced also that by or in the winter of 1961 she was considering giving, at some time or times, all of her art objects to the College. This is clear from the testimony of her companion that Mrs. Dodge had so told her. It is only reasonable, therefore, to believe the testimony of the College representatives that she had spoken likewise to them and I am inclined to believe that she went so far as to have said to them that "I am giving it." The difficulty of course is that expressions by a layman in this field are susceptible of several meanings, both on the part of the speaker and the hearer. See Mechem, The Requirement of Delivery in Gifts of Chattels, 21 Ill. L. Rev. 341 (1926). They can be meant or understood as either a present gift or a mere expression of intention to make a gift at some future date. By reason of this, I would not think it unreasonable for Messrs. McGraw, Murray and Shoemaker, in good faith, to believe that Mrs. *249 Dodge's intention was to make a present effective gift, with delivery thereof from time to time as she desired.
The original form of the May 16, 1961 letter given to Mrs. Dodge by Mr. McGraw in April, was prepared by President Murray, a layman. In view of the revision made by Mr. Winding, the lawyer-trustee, for the reason that it did not carry out her believed intention of a present gift as relayed to him by Dr. Murray, it is a fair inference that Dr. Murray and Mr. McGraw thought the original form did carry out this conception of Mrs. Dodge's intent and accomplished a present effective gift, with later delivery when she so wished. Mrs. Dodge, in telling Mr. McGraw in April that it was just what she wanted, obviously thought it meant no more than an expression of intent or desire to make a gift as she should choose in the future. This is demonstrated by her conduct after she signed the revised letter, which completely evidences that this was her true inward intent throughout, no matter what expressions she might have used in conversation.
I do feel, however, that Mr. McGraw had a positive obligation to fully explain to Mrs. Dodge the meaning and intended effect, as far as the College was concerned, of the revision in the letter, even if he felt it did no more than put in legal terminology his conception of the intent of the original draft. While I do not think he ought to be charged with fraud in not doing so, nonetheless, there was an equitable duty to be absolutely certain, in view of the change in language, that Mrs. Dodge fully understood and acquiesced in the legal effect of what she was being asked to sign. The failure in this respect, especially in the light of the unclear and confusing language of the letter as a whole, to which I have previously adverted, leads to the conclusion that the purported gift of the remainder interest should not be enforced. If the rationale of decision is to be on a factual approach, I do not think a reasoned evaluation of all the evidence fairly justifies condemnation beyond that set forth in this paragraph.
*250 I concur in the reversal of the trial court's judgment and in the direction for the entry of judgment in defendants' favor.
JACOBS and HALL, JJ., concurring in result.
For reversal  Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN  7.
For affirmance  None.